Brenda EVANS et al., Plaintiffs,

v.

Madeline BUCHANAN et al.,
Defendants.

Civ. A. Nos. 1816–1822.

United States District Court,
D. Delaware.

April 10, 1981.

Irving Morris, Joseph A. Rosenthal, and Kevin Gross, Morris & Rosenthal, Louis L. Redding, Leonard L. Williams, Wilmington, Del., Louis R. Lucas, Picard, Canale, Caywood, Lucas & Watson, Memphis, Tenn., Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Center for National Policy Review, Washington, D. C., for plaintiffs.

Nivea R. Castro Figueroa, and Paulette Sullivan Moore, Community Legal Aid Society, Inc., Wilmington, Del., for intervening Hispanic plaintiffs.

Henry N. Herndon, Jr., and P. Clarkson Collins, Jr., Morris, James, Hitchens & Williams, Wilmington, Del., for the New Castle County Bd. of Ed.

Richard S. Gebelein, Atty. Gen., State of Delaware, Regina M. Small, State Sol., and Roger A. Akin, Deputy Atty. Gen., State of Delaware, Wilmington, Del., for State of Delaware.

William Poole, James F. Burnett, and Vincent M. Amberly, Potter, Anderson & Corroon, Wilmington, Del., for Interim Bd. for Dist. 1.

James T. McKinstry, and Robert J. Katzenstein, Richards, Layton & Finger, Wilmington, Del., for Interim Bd. for Dist. 2 and Dist. 4.

Mason E. Turner, Jr., Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., Sp. Counsel to the Delaware State Bd. of Ed., for Interim Bd. for Dist. 3 and for State of Del.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This opinion treats a distinct phase of this protracted desegregation litigation.[1] The Court must pass upon the merits of a school district reorganization adopted pursuant to state legislation that would divide a single court-created school district into four independent school districts.

During the latter part of June, 1980, the Delaware Legislature passed Senate Bill No. 593 [2] relating to reorganization, governance and taxation of the public school system within the geographical desegregation area. Senate Bill 593 ("S.B. 593") authorized the defendant State Board of Education ("State Board") to implement the statutory objectives by formulation of a Plan or Rules and Regulations. Pursuant to that statutory authority, the State Board on November 20, 1980, promulgated regulations dividing the geographic desegregation area into four school districts governed by separate boards of education and addressing matters germane to the desegregation process, notably pupil assignment and ancillary relief. Defendant State Board now moves for modification of this Court's prior remedial decree "to permit implementation of the Reorganization." (Doc. No. 956). Plaintiffs, believing the plan will cause irreversible harm to the desegregation process, oppose the State Board's motion.

The Court concludes that division of the desegregation area into the four proposed independent districts would not, in itself, imperil desegregation. The reorganization proposal cannot be approved, however, unless legislation is passed codifying the power of the State Board to enforce the pupil assignment requirements incorporated in

---

1. This action was filed in federal district court in 1956 to enforce school desegregation necessitated by the United States Supreme Court's review of a Delaware State court case as one of the consolidated actions in the landmark *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*) and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). The suit, which now has 1043 docket entries, has progressed through several phases and generated numerous opinions and orders since its reactivation in 1971: *Evans v. Buchanan*, 379 F.Supp. 1218 (D.Del.1974), and 393 F.Supp. 428 (D.Del.1975) (three-judge court finding constitutional violations and requiring plan for desegregation among Northern New Castle County and Wilmington school districts), *sum. aff'd*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 *reh. denied*, 423 U.S. 1080, 96 S.Ct. 868, 47 L.Ed.2d 91 (1975); *Evans v. Buchanan*, 416 F.Supp. 328 (D.Del.1976) (three-judge court primary remedial decree), *appeal dismissed for want of juris. sub nom. Delaware State Board of Education v. Evans*, 429 U.S. 973, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976), *aff'd with modification*, 555 F.2d 373 (3d Cir.) (en banc), *cert. denied*, 434 U.S. 800, 98 S.Ct. 235, 54 L.Ed.2d 160 *reh. denied*, 434 U.S. 944, 98 S.Ct. 442, 54 L.Ed.2d 306 (1977); *Evans v. Buchanan*, 424 F.Supp. 875 (D.Del.1976) (denying stay of implementation of primary remedial decree as premature); 435 F.Supp. 832 (D.Del.1977) (granting partial stay and rejecting State Board's reverse volunteerism plan); *Evans v. Buchanan*, 447 F.Supp. 982 (D.Del.1978) (secondary remedial decree); 447 F.Supp. 1041 (D.Del.1978) (preliminarily enjoining implementation of State's four-district reorganization); 455 F.Supp. 692 (D.Del.1978) (declining to enjoin County Planning Board from setting school tax above rate set by State Board and Legislature); 455 F.Supp. 705 (D.Del.1978) (denying stay of secondary remedial decree); 455 F.Supp. 715 (D.Del.1978) (refusing to stay denial of school tax rate injunction), *on appeal*, 582 F.2d 750 (3d Cir. 1978) (en banc) (affirmance of secondary remedial decree and mandamus vacating County Planning Board school tax rate); 468 F.Supp. 944 (D.Del.1979) (enjoining school tax above rate set by State); 439 U.S. 1360, 99 S.Ct. 28, 58 L.Ed.2d 69 (1978) (Brennan, J.) (denying stay of secondary remedial decree); 439 U.S. 1375, 99 S.Ct. 32, 58 L.Ed.2d 83 (1978) (Rehnquist, J.) (denying stay of secondary remedial decree); 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (denying review of secondary remedial decree), *reh. denied*, 447 U.S. 916, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980); *Evans v. Buchanan*, 465 F.Supp. 445 (D.Del.1979) (approving escrow account for plaintiffs' legal fees).

2. School District Reorganization Act of 1980, 62 Del.Laws Ch. 351 (July 8, 1980) (codified in scattered sections of 14 *Del.C.Ann.* (Michie Supp.1980).

the State Board's Regulations. Rather than deny the State Board's motion, an interim order will be entered granting state authorities 60 days to adopt appropriate curative legislation. This solution is intended to accommodate the avowed preference of the State Board and the State of Delaware[3] for smaller school districts, while foreclosing the potential for federal judicial intrusion into matters of educational policy that are properly the concern of state authorities.

The history of this litigation has been detailed elsewhere,[4] and will not be repeated except insofar as is essential to an understanding of the issues presented by the State Board's motion. Pertinent factual details and findings will supplement the discussion on the merits. This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A. Prior Proceedings

The United States Supreme Court summarily affirmed my predecessor three-judge district court in its findings of an unconstitutional dual school system and vestige effects of de jure segregation in the former Wilmington school district and ten suburban districts in Northern New Castle County. 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975). Following that decision, the three-judge court concluded after an evidentiary hearing that an inter-district remedy was necessary. It rejected all proffered plans and, in recognition of the administrative burdens that would arise were an inter-district remedy to be imposed upon an eleven district school system, ordered the State Board to reorganize or consolidate the eleven school districts as an essential part

of any plan to effectuate the constitutionally required transition to a racially nondiscriminatory school system. 416 F.Supp. 328, 350 (D.Del.1976), aff'd, 555 F.2d 373, (3d Cir.), cert. denied, 434 U.S. 800, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

Having placed the responsibility for devising an inter-district plan for desegregation and reorganization or consolidation upon the State Board, my predecessor court also anticipated the state authorities' failure to have an acceptable plan operational by September, 1977. The court held that, in default of an adequate state plan, there would be a single school district for the desegregation area, which then comprised over 50% of Delaware's public school children. At the same time, it noted that the required change,

> although initially setting up a large district, is not only subject to appropriate subdivision for local control over issues of policy in particular schools, or local initiative with regard to curriculum, etc., but is also subject to redivision into smaller governmental units by action of the State, so long as such subdivision does not result in the frustration of the desegregation objective.

416 F.Supp. at 352–53 (footnote omitted). The United States Court of Appeals for the Third Circuit affirmed the three-judge court order with minor modification. 555 F.2d 373 (3d Cir. 1977).

State authorities demonstrated continued unwillingness to discharge their responsibilities by responding to the Court's call for a desegregation plan with legislation permitting unrestricted voluntary transfer and a woefully inadequate "reverse volunteerism" pupil assignment plan adopted by the State Board.[5] Rejecting the unsatisfactory pro-

---

3. The State of Delaware has now entered an appearance as a party defendant for all purposes. (Doc. No. 963).

4. See note 1.

5. The Court made these comments about the adequacy of the remedy then proposed by the State Board:

> Even if this Court were permitted to consider the State Board's proposal, the result in this case would be no different. I find the proposal unacceptable as an equitable remedy for the constitutional violations found by the three-judge court. The most obvious and significant flaw is that the proposal places the entire burden of the remedy on those whose rights have been violated. In formulating a

posals, this Court directed the parties to proceed with planning for the single district. At the same time a partial stay of implementation of the single district was ordered until the Supreme Court should act upon a petition for a writ of certiorari to review the affirmance by the Third Circuit Court of Appeals of the three-judge court's primary remedial decree. 435 F.Supp. 832 (D.Del.1977).

Faced with the state authorities' adamant and prolonged refusal to discharge their responsibilities, this Court, after an evidentiary hearing, issued a secondary remedial decree on January 9, 1978. That decree: (1) reorganized the eleven component districts of the desegregation area into one district; (2) addressed pupil assignment by requiring all students to attend schools in the former predominantly white districts for nine years and schools in the former predominantly black districts for three consecutive years ("9–3" plan), and requiring that a full 1–12 grade span be maintained within the City of Wilmington and that, at a minimum, one of the three former predominantly black high schools be utilized as a 10–12 grade center; and (3) provided for ancillary remedial relief. 447 F.Supp. 982 (D.Del.), aff'd, 582 F.2d 750 (3d Cir. 1978), cert. denied, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980).

Following issuance of the secondary remedial decree, the Delaware Legislature, in February 1978, approved a four-district reorganization for the desegregation area. Unhappily, it was too little, too late. It failed to provide for pupil assignment or to assign responsibility for enforcement of the pupil assignment plan contained within the secondary remedial decree. Further, the 1978 legislation failed to address or implement ancillary relief and allocation of costs. For these and other reasons the Court enjoined implementation of the 1978 four-district plan. 447 F.Supp. 1041 (D.Del.1978). Significantly, no appeal was taken.

On or about July 1, 1978, full operating authority was transferred from the eleven component districts to the newly created governance unit, the New Castle County Board of Education ("NCCBE") for the reorganized single school district, the New Castle County School District ("NCCSD"). In accordance with this Court's order, the five members of the newly created governance unit were selected by defendant State Board from the membership of the then-existing eleven component district boards. See 555 F.2d 373, 381 (3d Cir. 1977); Doc. No. 530.

The NCCBE implemented the court ordered pupil assignment plan by creation of four Attendance Areas. In three of the areas [6] a group of former predominantly white districts were paired with a portion of the predominantly black Wilmington district, while in the fourth area [7] a predominantly white district was combined with a predominantly black district. In addition, school authorities, by agreement, assigned to Area II responsibility for bilingual education of eligible Hispanic children.[8] This

---

remedy for constitutional violations, this Court must exercise its equitable powers. One would find it difficult to create a more graphic paradigm of an inequitable remedy than one which assigns to those who have been wronged the responsibility of correcting those wrongs. The uncontroverted testimony from State Board of Education personnel adduced at the hearings established that: no white student, suburban or city, would be assigned to a different school district, but every black student in Wilmington would be reassigned.
Evans v. Buchanan, 435 F.Supp. 832, 840–41 (D.Del.1977), aff'd, 582 F.2d 750 (3d Cir. 1978).

**6.** Area I, consisting of the former Claymont, Mt. Pleasant and Alfred I. duPont districts and a contiguous part of the former Wilmington

district; Area II, consisting of the former Alexis I. duPont, Conrad, Marshallton-McKean and Stanton districts and a contiguous portion of the former Wilmington district; and Area III, consisting of the former Newark district and a necessarily non-contiguous portion of the former Wilmington district.

**7.** Area IV, consisting of the former New Castle-Gunning Bedford and DeLaWarr districts.

**8.** P–IH81, Ex. 1, indicates that Area I would be assigned responsibility for bilingual education. At the present trial, counsel agreed that the document inadvertently specified Area I when all parties intended that Area II would assume responsibility for the bilingual program. Tr. J 12–13.

agreement was incorporated in this Court's January 9, 1978, Order. (Doc. No. 699, p. 10).

Since September 1978, public school children in the desegregation area have attended schools in the single, court-created district described above. On April 28, 1980, the Supreme Court of the United States denied certiorari petitions filed in October, 1978, requesting review of the secondary remedial decree as affirmed. On July 8, 1980, the Governor of the State of Delaware signed into law S.B. 593.

### B. Current Proceedings

The State Board considered S.B. 593 to be a legislative mandate to reorganize and change the method of governance of the desegregation area's single district. Tr. B 19 (Grossman). In the fall of 1980 the State Board authorized research, planning

A number of abbreviations will be used in this opinion to refer to exhibits offered at the evidentiary hearing on this matter. Exhibits offered by the State Board will be cited as "D–SBE81, Ex. _____"; Plaintiffs' exhibits will be cited as "P–4D81, Ex. _____"; Intervening Hispanic Plaintiffs' exhibits will be cited as "P–IH81, Ex. _____"; and the Court's exhibits will be cited as "CT–4D81, Ex. _____." All transcript references, unless otherwise noted, are to the hearings held on the State Board's motion, and will be referenced by volume and witness. The regulations adopted by the State Board to effectuate the reorganization will be referred to as "S.B.Regs."

9. See 14 Del.C.Ann. § 1028(k) (Michie Supp. 1980); S.B.Regs. § VI (P–4D81, Ex. 19 at 38).

10.

AMENDED TIME LINE

| Nov. 20, 1980 | State Board of Education to give final consideration to Regulations for the Reorganization of the New Castle County School District–1980 |
| Dec. 15, 1980 | Registered letter from New Castle County School District to all administrators notifying them that their contracts expire 6/30/81 |
| Dec. 17, 1980 | Last date for Clerk of the Peace in New Castle County to post notice of reorganized school district elections for interim board members (14 Del. C., § 1074(a)(1)) |
| Jan. 2, 1981 | Petitions due for interim board elections (14 Del.C. § 1075) |
| Jan. 31, 1981 (Saturday) | Interim board elections |
| Feb. 5, 1981 | Swearing-in of interim boards and instruction to Boards to organize under the provisions of 14 Del.C., Ch. 10 |
| Feb. 5, 1981 | School Tax District established |

and public hearings out of which developed a plan for reorganization. In November, Regulations embodying this plan were approved in the form in which they were initially presented to the Court. (P–4D81, Ex. 19).

All litigants believe, probably correctly, that the enabling section of S.B. 593 and the pertinent aspects of the Regulations, coupled with other state statutes, cause the State Board's reorganization authority to expire if the reorganization is not accomplished and operational by August 31, 1981.[9] Nonetheless, although S.B. 593 was signed into law in early July, the State Board did not approve final Regulations until November 20, 1980. As a consequence, the Regulations contain a necessary, but exceedingly difficult, time line that makes no allowance for litigation.[10] On November 21, 1980, de-

| Feb. 5, 1981 (to June 30, 1981) | Prepare for transfer of Real Property (Senate Bill 593, § 1009) |
| Feb. 9, 1981 | Earliest date State Board of Education will accept interim board budgets |
| Feb. 12, 1981 | Last date for scheduling elections to determine exclusive negotiating and bargaining representatives |
| Feb. 16, 1981 | Budgets for operation of interim boards through 6/30/81 due to State Board of Education |
| Feb. 19, 1981 | Regular Meeting of the State Board of Education—State Board acts on proposed budgets |
| Feb. 21, 1981 | Runoff elections (if needed) for interim boards |
| Mar. 16, 1981 | Interim board prepares table of organization showing needed administrative personnel |
| Mar. 30, 1981 | Last possible date for interim board elections (130 day limitation in Reorganization Act) |
| Mar. 26, 1981 | Last date for Clerk of the Peace in New Castle County to post notice of reorganized district elections for regular board members |
| Mar. 27, 1981 | Notify administrators of employment for fiscal year 1982 |
| Apr. 6, 1981 | Last date for scheduled elections to determine exclusive negotiating and bargaining representatives |
| Apr. 9, 1981 | Petitions due for regular board elections |
| Apr. 10, 1981 | Last date for administrators to claim "teacher option" |
| Apr. 15, 1981 | Registered letters from the NCCSD to employees other than administrators giving notice of termination of employment effective June 30, 1981 |
| Apr. 25, 1981 | Superintendents of interim districts and superintendent of NCCSD convene to finalize deployment of em- |

fendant State Board filed the instant motion. At the conclusion of two separate hearings on December 3, 1980, it was determined that the parties would endeavor to obtain an opinion of the Justices of the Supreme Court of Delaware on specified Delaware constitutional and statutory questions while simultaneously proceeding with discovery on the federal issues which was to be terminated by December 31, 1980.

The Delaware Supreme Court responded to the Governor's request for an advisory opinion on the state law questions by setting an expedited briefing and argument schedule. On December 29, 1980, that Court issued an en banc opinion to the Governor concluding that the legislation was consistent with the Delaware constitution. *Opinion of the Justices*, 425 A.2d 604 (Del.1980). While such an opinion is advisory, "is non-judicial and does not result in binding precedent," *Opinion of the Justices*, 424 A.2d 663, 664 (Del.1980), plaintiffs wisely refrain from further urging those State law issues.

Because resources were focused on the Delaware Supreme Court proceedings, the Court extended discovery until January 23, 1981, and ordered preliminary proposed findings of fact to be filed by plaintiffs and defendants on January 27 and January 30, 1981, respectively. (Doc. No. 969). Trial was scheduled to begin on February 4, 1981. (Doc. No. 970).

Meanwhile, in accordance with the State Board's necessarily tight time line, four interim school boards were elected January 31, 1981. At the February 4 hearing, the State Board made known its intention to swear the newly elected school board members into office the next day. As a consequence, the Court entered an order adding as parties defendant the four interim boards and their individual members in their official capacities. The Court then continued the hearing until February 9, 1981, so that the additional defendants might appear through counsel. (Doc. No. 997). The hearing resumed on February 9, 1981. Proposed Districts 1, 2 and 4 ultimately elected to be separately represented,[11] while District 3 chose to appear through special counsel for the State Board. Counsel for the District Boards declined to apply for a continuance beyond the time needed to arrange representation. Tr. C 7–9, D 1. The hearing on the merits occupied the greater part of two weeks and was

| | |
|---|---|
| | ployed personnel other than administrators |
| May 9, 1981 | Regular Board elections, except District II |
| May 25, 1981 | Notify all personnel, except administrators, of employment for fiscal year 1982 |
| June 1, 1981 | Set tax rates<br>a. $1.585 for current operations by county tax authority<br>b. Debt service rate set by county tax authority and State Treasurer at required level<br>c. Tuition, as needed, by interim boards<br>d. Minor Capital Improvements, as needed, by interim boards |
| June 1, 1981 | Complete exchange of data and resolutions under 14 *Del.C.*, Ch. 6 to authorize transfer of Hispanic Bilingual students |
| June 6, 1981 (Saturday) | Runoff election (if needed) for regular boards |
| June 30, 1981 | NCCSD dissolved and its board retired 12 midnight, E.D.T. |
| July 1, 1981 | Establishment date for "new" districts |
| July 1, 1981 | New Boards officially organized re 14 *Del.C.* § 1045 |

| | |
|---|---|
| Sept. 29, 1981 | Last possible date for transfer of real property (S.B. 593, § 1009) |
| June 30, 1982 | Recall lists established in FY '81 honored until this date |

S.B.Regs. § XII (P–4D81, Ex. 19 at 58–59). [Footnote and page references omitted].

On March 19, 1981, the State Board adopted certain amendments to the Regulations. (Doc. No. 1035). Those relevant to the Time Line read:

(a) The date for the giving of notice of termination of employment by the New Castle County School District to all employees except teachers, administrators and nurses is currently listed as April 15, 1981. That date has been changed to May 26, 1981.

(b) The date for notification of employment of all school employees except teachers, administrators and nurses by the Interim Boards of Education is currently listed as May 25, 1981. That date has been changed to June 29, 1981.

11. Districts 2 and 4 have retained the same counsel.

completed on February 23. On March 5, the Court, on its own motion, reopened the record for admission of additional facts developed in the interim by a Pupil Assignment and School Closing Committee established during the course of the hearings.[12] (Doc. No. 1009). When all parties had decided not to present additional evidence, the record was again closed. Expedited briefing encompassing a 2000 page trial transcript and over 90 exhibits was completed on March 23 and oral argument held on March 25, followed by supplemental letter briefing completed on April 1.

### C. *The Proposed Four-District Plan*

The legislature, in S.B. 593, gave the State Board authority to propose and implement a reorganization. It also restructured school board election procedures and taxation, established guidelines for employment of staff, and provided for transfer of property and financial obligations from the NCCSD to any new districts the State Board chose to create. Division of the single district as well as governance, pupil assignment and operational decisions fell to the discretion of the State Board. Testimony and argument have focused primarily on a few aspects of the Regulations. These challenged elements of the plan are described below, with brief allusion, as needed, to other features of the Regulations.

The reorganization plan adopted by the State Board would replace the present New Castle County School District with four autonomous school districts and corresponding school boards. Pursuant to statute, the State Board has set July 1, 1981, as the date for the dissolution of the NCCSD and its board and the assumption of authority by the four new boards of education. 14 *Del.*

*C.Ann.* §§ 1028(k)(13) & 1066 (Michie Supp. 1980). Each of the new boards will possess the powers traditionally exercised by local school boards in Delaware. The legislation sets an initial uniform tax rate to be levied by each of the districts to cover their current operating expenses and debt service, but authorizes each district to vary its current operating expense tax rate by referendum. 14 *Del.C.Ann.* § 1925 (Michie Supp. 1980). In addition, each board is empowered to set its own tax rates for tuition and minor capital improvements. 14 *Del.C.Ann.* § 1028(k)(10) (Michie Supp.1980).

Geographically, the four proposed districts closely resemble the NCCSD's Attendance Areas. Four changes in the Attendance Area boundaries [13] were made by school authorities, however, primarily for the purposes of maintaining racial balance and, to a lesser extent, narrowing differentials in assessed property valuation per pupil among the four proposed districts. It was hoped by the State Board that general adherence to the Attendance Area boundaries would prevent the major upheavals in pupil assignment that would be occasioned by full-scale redistricting without reference to current attendance patterns. Tr. B 19 (Grossman).[14] Districts 1, 2 and 4 are each a consolidation of some of the pre-1978 decree suburban districts paired with a section of Wilmington. District 3 is the former Newark district paired with a non-contiguous portion of Wilmington. In terms of gross student population, the black/white ratios are relatively similar among districts. Assessed property valuation per pupil varies substantially, however, as does the size of each district's total student population.[15]

Rather than develop a new pupil assignment plan, the State Board embraced *in*

---

**12.** Details of the Committee's appointment and task, as well as their evidence, are described *infra* at 860–863.

**13.** S.B.Regs. § VI, A (P–4D81, Ex. 19 at 40). At the same time the State Board's staff were planning district lines, the NCCSD's Research, Evaluation and Planning office had undertaken a revision of its pupil assignment plan. (P–4D81, Ex. 21 & 21A). Under the NCCSD proposals, Attendance Area boundaries would also

be shifted although in locations different from those chosen by the State Board. Tr. I 46–47 (Harrison).

**14.** Avoidance of disruption to students as a State Board objective is discussed *infra* at 853–854 & 856.

**15.** *See* D–SBE81, Ex. 1 at 4, excerpted *infra* at 859.

*toto* the pupil assignment criteria tailored to the single district in effect since the 1978 secondary remedial decree. Under the Regulations, each new district must prepare a pupil assignment plan in conformity with the Court Order of January 9, 1978; relevant provisions of the Order are incorporated as "the rule of the State Board." (S.B. Regs. § VI, B; P–4D81, Ex. 19 at 41). Thus, each district must implement a 9–3 assignment plan; a full 1–12 grade span must be maintained in Wilmington and at least one of the three former minority high schools must house grades 10–12; in addition a bilingual program for eligible Hispanic students must be provided. As will appear in detail below, the last three requirements present some difficulty. While the State Board's "rule" requires maintenance of a full grade span in Wilmington and utilization of a high school, no particular district or other entity has the assigned responsibility for ensuring implementation of this command. As in the Order, the Regulations assign responsibility for the Bilingual Program to proposed District 2. The Regulations also purport to provide for transfer of bilingual students residing outside District 2 into that district. The Regulations also adopt and incorporate those aspects of the Court's January 9, 1978, Order pertaining to ancillary relief. (S.B.Regs. § VII; P–4D81, Ex. 19 at 42–43).

This by no means comprehensive description of the State Board's four-district reorganization portrays the geographical structures and black-letter rules of administration that have been proposed, but the full implications of the motion to modify are not grasped by simple contemplation of the Regulations. In its true character, the reorganization is not a set of rules passively awaiting court validation; it is a process occurring now and consuming the energies of diverse governmental groups and school personnel. Many of these people wear two hats—for example, as members of the interim district boards and of the NCCBE. Administrators' prospects are unclear, and

their loyalties divided, yet their duties are doubled, for they must prepare to run the school system in the fall no matter what the decision of this Court. The complexity of current administrative relationships highlights another important aspect of the reorganization: It is a beginning of the process of shifting power from a court-created entity back to where it belongs—with appropriate state authorities. This long awaited process must be permitted to go forward if at all possible. The proper judicial concerns are two: Are the plaintiffs' unchallenged and hard-won rights in danger of being lost in the reorganization shuffle? If so, how can these rights be protected without federal intrusion upon the prerogatives of the state? Keeping these concerns in mind, attention is turned to plaintiffs' contentions.

## II. *PLAINTIFFS' OBJECTIONS TO THE REORGANIZATION PLAN*

Plaintiffs have mounted a two-pronged attack on the State Board's four-district plan. First, they argue that the State Board drew the proposed district boundaries with the racially biased motive of "protecting identifiably white interests at the expense of the black victims of the underlying constitutional violation."[16] Second, plaintiffs contend that implementation of the plan of reorganization would impede the constitutionally required transition to a racially nondiscriminatory school system.

### A. *The Plan Violates Plaintiffs' Constitutional Rights*

In making the claim that the proposed four-district plan is the product of racially discriminatory motivation, plaintiffs argue that the Court must assess the plan against the backdrop of past acts of official discrimination that are the recorded history of this case and the past defaults of the State Board in taking the constitutionally and judicially required affirmative action to dismantle the dual school system. According

**16.** Plaintiffs' Brief in Opposition to State Board's Motion for Modification (Doc. No. 1018) at 1.

to plaintiffs the boundary lines of the four-district plan that was enjoined by the Court in 1978 and the boundary lines of the Attendance Areas of the New Castle County School District were the knowing products of racial bias. On the basis of the similarities between the proposed district lines and the boundary lines of the 1978 plan and of the New Castle County School District's attendance zones, as well as perceived substantive and procedural "anomalies," plaintiffs would have the Court draw the inference that the plan is infected with racial bias.

The crux of plaintiffs' objections to the three schemes is that each in some manner divided up the predominantly black former Wilmington School District, while preserving substantially intact the predominantly white former suburban school districts. Preservation of the suburban districts intact allegedly protected the interests of their predominantly white populations, while Wilmington was forced to pay the price of reorganization because it was the source of the desegregation "problem." Other aspects of the plan advanced as evidence of racial animus include: 1) the imposition of four separate tax rates on the City of Wilmington; 2) the creation of one district out of a section of Wilmington and the non-contiguous, overwhelmingly white former Newark School District; 3) boundary drafting decisions claimed to impose a disproportionate burden of dislocation on Wilmington children; and 4) the differential in student population size and assessed valuation per pupil among the four districts. These "anomalies," according to plaintiffs, are further evidence of the bias in favor of protecting identifiably white suburban interests. Finally, plaintiffs argue that the nominating districts and election procedures of the proposed district were drafted in a manner that may minimize black representation on the school boards. They conclude that the Court must reject the plan because the State Board has failed to produce any

evidence that the boundary lines would have been the same had "official racial discrimination . . . played *no* part in the State Board's reorganization decision." [17]

### B. *The Reorganization Plan Impedes Desegregation*

Plaintiffs argue that the proposed reorganization must be rejected because it will impede the as yet uncompleted transition to a racially nondiscriminatory school system and the elimination of the vestiges of *de jure* segregation. They attribute difficulties in the desegregation process to state and local district officials' indifference to the need to eradicate the vestiges of discrimination and to a disregard for the substance and spirit of the Court's desegregation order. Official default in the face of the constitutional obligation continues, plaintiffs argue, and it infects the present proposal.

Plaintiffs cite critical omissions from the plan as impediments to effective continuation of the desegregation process. They point out that while the New Castle County Board of Education has before it a comprehensive school closing and pupil assignment proposal (P–4D81, Ex. 21A), no such proposal is included in the four-district plan. Moreover, assuming school closings were to be undertaken by boards of the proposed four districts, there is no plan ready to insure that faculty and staff will be assigned so as to eliminate schools that are racially identifiable by personnel. Another flaw identified by plaintiffs is the absence of mechanisms for resolving disputes among the four districts regarding pupil assignment and allotting responsibility for maintaining the grade spans and educational facilities in Wilmington required by the Court Order and the Regulations. Finally, plaintiffs argue that the plan will impede desegregation because it fails to address such alleged problems as continuing segregation in classrooms and disproportionate discipline of blacks.[18]

---

17. *Id.* at 29 (emphasis in original) (footnote omitted).

18. In Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Doc. No. 976), submitted prior to the hearing, a number of other defects

## III. ANALYTIC FRAMEWORK

The State Board's motion raises novel and difficult questions relating to the legal standards to be applied when a party defendant in a school desegregation case, after a long history of default, seeks to persuade the Court that it is prepared to take up its duty to provide a racially non-discriminatory school system. This case is especially unusual because the State Board has not presented a comprehensive plan of desegregation to the Court, but seeks approval of a plan of reorganization that would incorporate *in toto* the pupil assignment and in large measure other remedial aspects of a court decree that has now been in effect for nearly three years. This section will describe the legal standards by which the Court has determined the State Board's motion should be judged.

### A.

 The State Board's request for permission to implement its plan of reorganization calls upon the Court to exercise its well established discretionary power, codified in Rule 60(b)(5) of the Federal Rules of Civil Procedure,[19] to modify or vacate an equitable decree "if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *System Federation v. Wright*, 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). *See United States v. United Shoe Corp.*, 391 U.S. 244, 248–49, 88 S.Ct. 1496, 1499, 1500, 20 L.Ed.2d 562 (1968); *United States v. Swift & Co.*, 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–63, 76 L.Ed. 999 (1932). This power to modify a decree applies equally well to school deseg-

regation cases. *See Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 437, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976). Because an injunctive decree does not create any vested rights in the party in whose favor the decree was entered, but is a remedy designed to vindicate a right,[20] the court, upon a proper showing, may modify or vacate a decree over the objection of the protected party.

 The proper exercise of discretion in cases of this nature has been characterized in a number of ways. A court may be duty bound to modify a decree at the request of a plaintiff who demonstrates that the decree has not been effective in achieving the relief to which the plaintiff was entitled. *United States v. United Shoe Corp., supra*, 391 U.S. at 251, 88 S.Ct. at 1500. Conversely, a defendant may not be relieved of burdens imposed by a decree unless the relief the decree was intended to effect has been fully accomplished. *United States v. Swift & Co., supra*, 286 U.S. at 119, 52 S.Ct. at 464. However characterized, these cases reflect the principle that the prevailing party is entitled to a decree that will fully vindicate the rights recognized in the judgment. In considering when modification is appropriate, the courts have imposed substantial burdens upon defendants seeking relief from obligations under an equitable decree. It has been said that the defendant must make "a clear showing of grievous wrong evoked by new and unforeseen conditions," *id.* at 119, 52 S.Ct. at 464, or that the defendant "must bear a heavy burden" of showing that changed circumstances have eliminated the dangers the

in the plan are alleged to impede desegregation. Plaintiffs claim: the change from one school district to four autonomous ones will impair the flexibility in pupil assignment that is needed to prevent unnecessary busing or removal from neighborhood schools and to avoid racially identifiable schools; it will be impossible to maintain a full 12-year grade span in the Wilmington portion of each of the four new districts; creation of four districts will impede effective implementation of the ancillary relief services required by the desegregation decree; division of Wilmington among the four districts will break up the leadership in the Wilmington

minority community; and four separate school administrations and curricula within Wilmington will cause disruption in the educational services provided to the mobile minority residents of the city.

19. Rule 60(b)(5) permits the Court to relieve a party from a final judgment or order when "it is no longer equitable that the judgment should have prospective application."

20. 7 Moore's Federal Practice ¶ 60.26[4] at 329–30 (2d ed. 1979).

decree was designed to correct and that, absent such relief, extreme and unexpected hardship will result. *Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977).[21]

■ This case is not, however, one of court imposed restraints on a private corporation or individual, but rather involves extraordinary judicial involvement in the selection of a system of organization and governance for the public schools of Northern New Castle County. It is axiomatic that state and local authorities are responsible for running public school systems. This Court decreed a single district school system only after state authorities abdicated their responsibility to come forward with a plan of reorganization compatible with the mandate to eliminate the dual school system and the vestige effects of *de jure* segregation.[22] In effect the State Board now argues that there has been a change in the material facts upon which the Court relied in ordering the implementation of a single district school system—the change being that the State Board has at last proposed a plan of reorganization that is compatible

with the constitutionally required process of desegregation. The Court's concern for the important values of local control of the public schools requires that it give special consideration to a proposed modification of its decree when it appears that local authorities may be prepared to assume responsibility where in the past they have defaulted.[23]

■ Therefore, in considering the proposed modification of the desegregation decree, it is necessary to balance the right of local authorities to run public schools against standards commonly applied to motions for modification of an injunctive decree. The broad discretion that may exist in other cases to reject a defendant's request for relief from a decree cannot be permitted in a school desegregation context. Instead, the State Board's motion must be judged by a very simple test: Will the proposed modification in the system of organization of the public schools permit the effective continuance of the transition to a unitary school system and the elimination of the vestiges of *de jure* segregation?[24] If

**21.** Recent cases in the Court of Appeals for the Third Circuit discussing standards for modification of equitable decrees have dealt with defendants seeking relief from consent decrees. *See Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1119–21 (3d Cir. 1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); *United States Steel Corp. v. Fraternal Association of Steel Haulers*, 601 F.2d 1269, 1273–74 (3d Cir. 1979); *Mayberry v. Maroney*, 558 F.2d 1159, 1163–64 (3d Cir. 1977). Although these cases indicate that defendants seeking relief from a consent decree may have a burden "even more formidable than had they litigated and lost," 602 F.2d at 1120, they nonetheless make clear that defendants seeking relief from a decree entered after unsuccessful litigation also have a substantial burden to meet.

**22.** Reorganization of the former eleven districts was required not because such a reorganization would itself achieve desegregation, but because "otherwise an inter-district plan would fail by reason of its administrative burden." 416 F.Supp. 328, 352 (D.Del.1976). Neither this Court nor the Court of Appeals required that the desegregation area be reorganized into any particular number of districts. This Court mandated a one district system only after state officials failed to heed repeated requests that they develop a plan of reorganization which would permit timely and effective implementa-

tion of an acceptable desegregation plan. The 1978 Four District Plan was enjoined not because a four district reorganization was inherently defective, but because that particular plan failed to address many of the practical problems of the impending desegregation effort and its implementation at that late date would have produced "utter chaos." *See* 447 F.Supp. at 1050.

**23.** *Cf. Spangler v. Pasadena City Board of Education*, 611 F.2d 1239, 1245 n.5 (9th Cir. 1979) (Kennedy, J., concurring) (judicial concern for local control of school systems dictates that desegregation decree not extend beyond the time necessary to remedy effects of past intentional discrimination).

**24.** The purpose of this test is, of course, to ensure plaintiffs' constitutional right to the creation of a unitary school system. To the extent that the State seeks to take up its duty to reorganize the schools in Northern New Castle County, the effect, when viewed in conjunction with those aspects of the Court's remedial decree that remain intact, must be a desegregation plan that "promises realistically to work *now*." *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (emphasis in original).

the evidence adduced by the State Board persuades the Court that the answer is yes,[25] then the Court will be obliged to permit the State Board to implement its chosen system of reorganization and governance for the public schools of Northern New Castle County.

■ In placing on the State Board the burden of persuading the Court that the proposed reorganization is compatible with the desegregation process, the Court is not unmindful of its duty to accord legislative enactments "a presumption of regularity and constitutionality." *Evans v. Buchanan*, 582 F.2d at 779.[26] Accordingly, the Court will presume that it was drafted without intent to impede desegregation and will be applied in a manner consonant with desegregation. However, presuming the good faith of state authorities in drafting and implementing the plan does not resolve the question before the Court. To the extent that reorganization is an essential element of a desegregation remedy in Northern New Castle County, this Court must determine whether the reorganization plan proposed by the State Board is one which, irrespective of intent, will have the *effect* of continuing the desegregation process. To presume that the General Assembly and the State Board acted in good faith does not relieve the State Board of its burden of establishing that the desegregation decree, if modified to permit the proposed reorganization, will remain a meaningful remedy.[27]

Since the State Board has not yet succeeded in establishing a unitary school system,[28] its conduct must be measured by "the effectiveness, not the purpose, of [its] actions in decreasing or increasing the segregation caused by the dual system." *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979) (citations omitted).[29]

Finally, it is important to bear in mind just what modification in the decree is sought. The State Board requests modification only to the extent necessary to permit implementation of a four-district reorganization scheme. The State Board neither questions the plaintiffs' right to, nor the need for, those elements of the decree assignment plan, the maintenance of certain grade structures and educational facilities in Wilmington, and the ancillary relief and bilingual programs. Unless and until the Court has been persuaded that changed circumstances warrant modification or vacation of those elements of the decree, plaintiffs are entitled to have the decree completely and vigorously enforced. Therefore, before authorizing implementation of the reorganization plan, the Court must determine that it would not endanger those elements of the decree that are unchallenged and remain intact.

### B.

Plaintiffs claim that the plan must also be rejected because it constitutes a fresh

---

**25.** The State Board recognized its burden to satisfy such a test in its Pre-Trial Findings of Fact and Conclusions of Law: "The State Board of Education acknowledges its burden to establish that implementation of this proposal will not materially interfere with the desegregation effort and that it is capable of timely and effective implementation for the school year which commences in September, 1981." (Doc. No. 979 at 3). *See also* Tr. N 59.

**26.** The Court assumes for purposes of this opinion that regulations adopted by the State Board pursuant to permissive authorization of the Legislature are entitled to the same presumption of regularity and constitutionality as a tax rate set by the State Board pursuant to a mandatory direction of the Legislature. The Delaware Supreme Court has held that duly adopted regulations of the State Board of Education "have the force of law, and are binding

upon all local boards." *Steiner v. Simmons*, 111 A.2d 574, 583 (Del.1955).

**27.** *Cf. Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (school board must "establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation").

**28.** *See* note 55 *infra*.

**29.** This standard reflects the affirmative duty of the State Board "not to take any action that would impede the process of disestablishing the dual system and its effects." *Dayton Board of Education, supra*, 443 U.S. at 538, 99 S.Ct. at 2979. *See Wright v. Council of Emporia*, 407 U.S. 451, 470, 92 S.Ct. 2196, 2207, 33 L.Ed.2d 51 (1972).

violation of their rights under the fourteenth amendment's equal protection clause. The essence of this claim is that the authors of the reorganization plan drew the boundary lines of the four proposed districts with the purpose and effect of promoting perceived white suburban interests and disadvantaging the interests of black Wilmington residents. It is important to note that this claim is analytically distinct from plaintiffs' argument that implementation of the reorganization plan will impede desegregation. If, for example, the State Board were to establish that the plan would not impede desegregation, plaintiffs could nonetheless prevail by proving that the inevitable disruptive effects of reorganization will bear most heavily on black Wilmington residents, and that such a disproportionate impact was one of the motivating factors of the drafters in adopting this particular reorganization plan and its attendant boundaries. That is, the plan must be held constitutionally infirm if plaintiffs prove both that it will have a racially disproportionate impact and that it was adopted with a racially discriminatory purpose. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 239–42, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976).[30] I will first address plaintiffs' constitutional claim and then determine whether the reorganization plan is compatible with desegregation.

## IV. PLAINTIFFS' CONSTITUTIONAL CLAIM

Plaintiffs' constitutional challenge to the four-district plan raises the claim that the boundaries of the proposed districts were drawn in a manner intended to protect identifiably white interests and to disadvantage the black victims of the underlying constitutional violation. According to plaintiffs, the State Board manipulated the neutral criteria of establishing school districts with reasonably similar student populations, racial ratios, and taxable wealth per pupil so as to further the racially discriminatory purpose of dividing Wilmington, while retaining whole suburban districts intact. Resolution of plaintiffs' claim requires the Court first to determine whether the proposed reorganization both has a disproportionate adverse effect on blacks and then to consider whether the plan was the product of a racially discriminatory purpose.[31]

### A. *Adverse Impact*

Although implementation of the four-district plan will not have an immediate effect on the day-to-day lives of most Wilmington school children,[32] it may fairly be said that creation of four autonomous school districts will adversely affect the black community in Wilmington. The most significant effect on Wilmington will be the parceling out of the city among four independent political units, whereas in the past Wilmington was either a single political unit, or included undivided in the New Castle County School District. Thus, to the extent that predominantly black interests in Wilmington have succeeded in developing political power and influence in the single district, they would, after reorganization, need to rechannel that power and influence in four different directions.[33] Such a rea-

---

30. If plaintiffs were to establish these two elements, the burden would then shift to the State Board to show that the same plan would have been adopted even in the absence of a racially discriminatory purpose. *See Arlington Heights, supra*, 429 U.S. at 270 n.21, 97 S.Ct. at 566 n.21; *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The State Board, however, did not seek to introduce evidence establishing that the plan would have been no different assuming that it was infected with racial bias.

31. *See Arlington Heights, supra; Washington v. Davis, supra.*

32. Approximately 1900 students throughout the NCCSD will be assigned to new districts that do not correspond to their former Attendance Areas. Tr. D 22 (Nichols). Of these 1900 students, at least 400 live in the predominantly white former Stanton District. Tr. D 20 (Nichols).

33. *E. g.*, Tr. K 170–72 (Sills).

lignment of black political forces would cause significant disruption and probably a net diminution of the ability of the black community to affect decisions regarding the administration of schools in New Castle County. In addition, it appears that there is a much higher rate of intra-district school transfers among Wilmington students than among suburban students.[34] Therefore, if the four districts should develop different curricula and disciplinary standards, Wilmington students whose intracity housing changes mean a move into a different school district may face significant adjustment problems that they would not face in a single district system.

## B. *Discriminatory Purpose*

In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*,[35] the Supreme Court identified some of the kinds of evidence that may be probative of discriminatory purpose. These include (1) the disproportionate impact of the enactment; (2) "[t]he historical background of the decision . . ., particularly if it reveals a series of official actions taken for invidious purposes"; (3) the specific series of events leading up to the decision, including departures from normal procedural sequences; and (4) any available legislative or administrative history. *See* 429 U.S. at 266–68, 97 S.Ct. at 563–65. I will examine such of these evidentiary sources as are in the record and determine whether plaintiffs have met their burden of establishing discriminatory purpose.

The legislation authorizing the proposed reorganization reflected the Delaware General Assembly's "overriding and explicit concern 'to preserve the historic concept of semi-autonomous locally controlled school districts throughout the State' and 'to continue the statewide process of reorganization of school districts.'" *Opinion of the*

*Justices*, 425 A.2d 604, 607 (Del.1980). Nothing in the record indicates that the boundaries adopted pursuant to that legislation are simply a pretext for racial discrimination. In *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), the Supreme Court concluded that a Massachusetts law that gave a preference in public employment to veterans was not a pretext for gender-based discrimination against women because the law served the "legitimate and worthy" purpose of benefiting veterans and because it also disadvantaged a considerable number of men. *See* 442 U.S. at 274–75, 99 S.Ct. at 2293. Similar evidence in this case warrants the conclusion that the division of Wilmington was not a pretext for discriminating against blacks. First, the decision to divide Wilmington was for the legitimate purpose of creating racially balanced districts that would be consistent with the continuing transition to a unitary school system. Counsel for plaintiffs conceded at oral argument both that the State has the right to create multiple districts out of the present single district and that any such reorganization could not be accomplished without some division of Wilmington. Tr. N 139–41. Second, the decision not to divide the former suburban districts was premised, at least in part, on the State Board's judgment that it would minimize the disruption to students inherent in both desegregation and reorganization. Tr. B 60 (Grossman). The proposed boundaries would further the legitimate state purpose of minimizing disruption to students while creating school systems compatible with desegregation. Finally, a reorganization plan which does not divide former suburban districts would benefit blacks and disadvantage whites in not insignificant numbers. Approximately 14% of the public school students in Wilmington are white,[36] while one formerly

---

**34.** *See* P–4D81, Ex. 20; Tr. H 183–86 (Harrison).

**35.** 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

**36.** *See* CT–4D81, Ex. 6. This figure, which includes kindergarten students, may be slightly overstated since the category of "O" or "Other" students from which this percentage is derived also includes minority students other than blacks and Hispanics. However, testimony indicated that the number of minority stu-

predominantly black district—DeLaWarr—benefited from the policy decision to split up only the former Wilmington district. In view of these facts, there is no basis for concluding that the boundary configurations adopted by the State are merely a pretext for discriminating against blacks.

Since the decision to divide Wilmington while preserving the suburban districts intact was not a pretext for racial discrimination, the issue is whether plaintiffs have shown that a racially-based "discriminatory purpose has, at least in some measure, shaped"[37] the drawing of the boundary lines.

The heart of plaintiffs' claim that a racially discriminatory purpose was a motivating factor in the selection of the boundary lines is found in the argument that the present plan incorporates and perpetuates the racially discriminatory boundaries of the State Board's 1978 four-district plan and the NCCBE's attendance areas. Assuming that preparation of those past plans was motivated by racially discriminatory considerations, adoption now of a substantially similar plan would be probative of a claim that the present plan was adopted with a racially discriminatory purpose. See Arlington Heights, supra, 429 U.S. at 267, 97 S.Ct. at 564. This Court, however, has never held that any boundary proposals of the State Board or the NCCBE were the product of invidious racial considerations, nor has it held that a plan that incorporates whole suburban districts is patently discriminatory. Therefore, the similarity of this plan to past boundary proposals, standing alone, is of no probative value.

The past reorganization efforts of the State Board are, however, material in that they reveal a consistent policy of the State Board that any school district reorganiza-

tion in the desegregation area should seek to avoid the division of any former suburban districts. All plans seriously considered by the State Board, including the 1978 four-district plan enjoined by the Court, were prepared on the principle that any new school districts should be created by consolidating a portion of Wilmington with some combination of former suburban districts.[38] No serious consideration was ever given to a reorganization that would create new school districts without regard to any of the former district lines.[39] The NCCBE apparently followed the same policy when it drew the boundary lines of the four present Attendance Areas which formed the starting point for the present four-district plan.[40] Finally, in the development of the present plan, it is clear that the only type of reorganization considered was one that would substantially incorporate the Attendance Area lines as district boundaries.[41]

The question before the Court is not whether the present redistricting plan is racially discriminatory because it is substantially similar to past plans. Rather, the Court must decide whether the policy of the State Board that any reorganization of the desegregation area should divide Wilmington while preserving whole former suburban districts intact, as applied in this case, is racially discriminatory. More specifically, the question is whether such a policy reflects a racially discriminatory purpose that was a motivating factor in the creation of this four-district plan.

█ This Court is unwilling to conclude that proof that the State Board sought to retain suburban districts intact, and proof that those suburban districts are overwhelmingly white, establishes a racially discriminatory purpose. Testimony established several reasons behind the policy of

---

dents other than blacks and Hispanics is statistically insignificant. Tr. M 89 (Harrison).

37. *Feeney, supra*, 442 U.S. at 276, 99 S.Ct. at 2294.

38. *E. g.*, Tr. G 94–95, H 87–88 (Row).

39. *E. g.*, Tr. H 92–94 (Row).

40. Although it is clear that the Attendance Areas of the NCCSD are consolidations of whole former suburban districts and portions of Wilmington (Tr. I 189–91 (Harrison)), no evidence was adduced regarding why that type of plan was adopted.

41. Tr. G 24 (Row).

retaining the suburban districts intact. The primary reason was a desire to retain intact as much as possible communities that had developed around certain schools.[42] Preliminary efforts at reorganization also revealed substantial practical problems in devising a reorganization plan that would have completely disregarded the boundary lines of the former suburban districts.[43] Finally, past reorganizations of Delaware school systems had traditionally been achieved by consolidating whole districts.[44] Against these considerations must be contrasted the unchallenged conclusion of the State Board that if the NCCSD were to be reorganized into multiple districts in a manner that would be consistent with the desegregation process the former Wilmington district, home of the plaintiff class, would somehow have to be apportioned among the newly created districts.

It is undeniable that if students are benefited by not having their former school districts divided among new autonomous school districts, it is white suburban students who have disproportionately benefited from the reorganization. The evidence, however, indicates that only the suburban districts were preserved intact because responsible officials reasonably concluded that only the suburban districts could avoid dismemberment in a reorganization plan that would be consistent with the requirements of desegregation. Plaintiffs have pointed to no evidence which demonstrates that the State Board divided Wilmington *because* its students are predominantly black nor to any evidence which demonstrates that the former suburban districts were preserved intact *because* its students are predominantly white. Discriminatory purpose is not established simply because the State Board knew, or should have known, that black Wilmington residents would bear disproportionate adverse effects of the reorganization. Rather, discriminatory purpose "implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney, supra,* 442 U.S. at 279, 99 S.Ct. at 2296. Here the record indicates that the reorganization was prompted by a considered and legitimate state objective of reducing the Court-created school district to a size that would be more easily manageable and more responsive to the concerns of parents and of taxpayers. In so doing, the State Board responded to the repeated invitations of the federal courts to reorganize the New Castle County schools in a manner consistent with the goals and needs of desegregation. I decline to conclude that adherence to a policy of avoiding division of former suburban school districts necessarily reflects an invidious racial purpose.[45]

**42.** Tr. H 87–88 (Row).

**43.** *E. g.,* Tr. H 92–94 (Row).

**44.** Tr. H 92–93 (Row); *see Opinion of the Justices,* 246 A.2d 90, 94 (Del.1968) (school reorganization statute prohibited subdivision of existing school districts).

**45.** Plaintiffs read too much into the testimony of Dr. Row. They highlight, for instance, his response to an inquiry whether the State Board sought to keep the suburban districts intact (Tr. H 87–88):

Yes, sir, in all of these plans. We tried to stand in a number of places. We tried to stand in several parts of the law and in tradition and in history. And, because people have built houses, communities drawn up around schools or schools within the communities, people look to a certain direction, highways run a certain direction, we tried to keep together units that had been together with the exception of Wilmington. Our logic was that the desegregation problem originated in Wilmington, the instructions of—well, going back to the guilt, or whatever you call it, the liability of the State Board of Education, the problem was that there was a large concentration of minority youngsters in Wilmington and places had to be found for them.

At one time, we had drawn a little map on concentric circles; that didn't look too good. So, then, we got into the—what I'll call the "pie slice" type of thing and the question was, how can we make an arrangement that will let Wilmington children and suburban children exchange schools to bring about this thing called "desegregation." And, I think if you'll look at the map, you'll see that that was accomplished, except in this instance of the island in District III we just couldn't get a reasonable piece through there without cutting up more districts. Obviously, we held

Although the State Board's consistent policy that any reorganization should avoid splitting up former suburban districts was important, another substantial motivating factor also contributed to the adoption of the proposed boundaries. The State Board, in approaching the task of reorganization, was faced with the fact that four Attendance Areas, created by the NCCBE, were already in place. The testimony of officials of the State Board and the Department of Public Instruction established that the underlying premise of the present reorganization was to avoid disruption to students by adopting the Attendance Area lines as the district boundaries to the extent possible.[46] Thus the process by which the proposed district boundaries were selected was to adopt the Attendance Area lines as district lines, and then to make any adjustments necessary to satisfy the State Board's criteria that the four resulting districts be racially balanced and have acceptable assessed property values per student.[47]

Thus it may fairly be said that the State Board adopted a reorganization plan that would join portions of Wilmington to clusters of former suburban school districts both because it determined such a plan was educationally sound and because the framework for such a reorganization was already in place. I find no basis for concluding that racial discrimination was one of the motivating factors.

Plaintiffs also contend that the modifications made in the Attendance Area lines to produce the proposed district lines were racially tainted. Testimony by the administrator primarily responsible for drafting the boundary lines indicated that such modifications were necessary to rectify unacceptable imbalances in the racial ratios and assessed values per pupil of the proposed districts.[48] The effect of these modifications was to place approximately 1900 students in school districts which do not substantially correspond to their present Attendance Areas. Plaintiffs claim that these modifications bore more heavily on black Wilmington interests than on white suburban interests. Initially it should be noted that at least 400 of these 1900 students reside in a predominantly white portion of the former Stanton school district.[49] Assuming that claim is true, however, plaintiffs have been unable to point to any evidence which would indicate that racial discrimination was one of the motivating factors in adopting the particular modifications. Indeed, plaintiffs would shift to the State Board the burden of establishing that the modifications were not racially discriminatory because of "the racially tainted genesis of the basic boundaries for the proposed four districts. . . ."[50] However, because plaintiffs have failed to establish that adoption of the Attendance Area lines as district boundary lines was racially tainted, their claim that the modifications were also discriminatory must fail. On this record, the Court concludes that the modifications in the boundary lines were adopted as a practical and efficient means of attaining racially balanced districts, a permissible State Board objective.

■ Past constitutional violations of the State Board and its default in the face of its duty to dismantle the dual school system are relevant considerations in deciding

together communities and one community is a school district. The City of Wilmington was divided.

The statement recognizes the self-evident truth that desegregation created very real problems for blacks and whites, city dwellers and suburbanites. It also recognizes the fact a multidistrict reorganization would require division of Wilmington, but that it might be possible and indeed even more efficient to avoid division of the former suburban districts. The testimony cannot be fairly read to reflect a bias of the State Board to the effect that "the blacks created this desegregation problem, so let's make them pay the price of reorganization."

46. E. g., Tr. B 60 (Grossman); Tr. D 168 (Ryan); Tr. G 24 (Row).

47. Tr. D 16–24 (Nichols); D–SBE81, Ex. 1.

48. Tr. D 13–22 (Nichols).

49. Tr. D 20–21 (Nichols).

50. Plaintiffs' Brief in Opposition to State Board's Motion for Modification (Doc. No. 1018) at 23.

whether the present plan was adopted with an invidious purpose. *See Arlington Heights, supra,* 429 U.S. at 267, 97 S.Ct. at 564. Those past wrongs, however, do not permit the Court to presume that all subsequent actions of the State Board are unconstitutionally motivated. *Cf. Evans v. Buchanan,* 582 F.2d at 774–80. There is neither direct evidence in the record that the reorganization plan was the product of a discriminatory animus, nor are the State Board's past misdeeds adequate circumstantial evidence upon which to find the reorganization plan unconstitutional. Similarly inadequate is the other circumstantial evidence upon which plaintiffs rely in support of their claim that boundary lines were drawn with a discriminatory purpose. Plaintiffs point for example to the fact that the proposed reorganization contains no plan for school closings or for reassigning faculty and staff on a racially integrated basis. The Court agrees that there is evidence of a need for a comprehensive school closing plan[51] and that some schools are racially identifiable by reason of staff assignments. The Court, however, cannot infer an invidious racial purpose from the fact that the reorganization plan does not address all of the problems that exist now in the single district and will still be there if the four districts come into being. Strong action is needed, whomever may be the governing authorities this fall, to close unneeded schools and confront such problems as racially identifiable classrooms and racially disproportionate school suspensions. That such problems exist, however, does not forever tie New Castle County to a single school district.

█ Plaintiffs also point to a number of so-called substantive and procedural "anomalies" in the plan. They argue that the

substantial disparities in pupil enrollment and taxable wealth per pupil,[52] for example, support an inference of a racially invidious purpose. The evidence showed, however, that these inequities resulted because creating racially balanced districts and minimizing disruption were the foremost considerations, while enrollment size and taxable wealth were sought to be kept within acceptable ranges. Indeed testimony regarding the process of drawing district lines persuades the Court that it would have been well-nigh impossible to create four racially balanced districts with equal enrollment and wealth without causing tremendous disruption. The Court also is convinced that creation of a non-contiguous school district, i. e., joining a portion of Wilmington with the area corresponding to the former Newark school district, does not indicate that the plan was the product of racial bias. Although the creation of a disjointed school district is at first startling, this district merely incorporates present student assignment patterns and its adoption minimizes disruption.

Finally, plaintiffs have been unable to point to any evidence that the boundaries of the nominating districts within the proposed districts were drawn in a manner intended to minimize representation of the black community. Plaintiffs' argument is now apparently reduced to a claim that the nominating districts are defective because they are included within school district boundaries that they argue are infected with racial bias.[53] Moreover, the results of January elections to the interim school boards substantially diminish plaintiffs' claim. Five of the twenty-three persons elected to interim boards are black and each received more votes than some of the whites elected to the boards.[54]

---

51. The administrative staff of the New Castle County School District has prepared a school closing plan for the consideration of the New Castle County Board of Education. The Court created a School Closing Committee when testimony on the instant motion indicated that the proposed four school boards would need a detailed school closing proposal adaptable to their needs should the reorganization plan be implemented.

52. *See infra* at 859.

53. *See* Plaintiffs' Brief in Opposition to State Board's Motion for Modification (Doc. No. 1018) at 30 n.74.

54. Tr. G 4–6 (Row).

In sum, the evidence does not demonstrate that the reorganization plan was adopted with a racially discriminatory purpose. Plaintiffs have therefore failed to make out a violation of their fourteenth amendment rights.

## V. COMPATIBILITY OF THE PLAN WITH DESEGREGATION

The Court's primary concern must be the effect implementation of the reorganization plan will have on the ongoing process of desegregation.[55] In order to meet its burden of persuading the Court that implementation of the reorganization plan will not imperil desegregation the State Board must establish two basic facts: First, that the plan will not now, nor in the reasonably foreseeable future, create racially identifiable school districts; and second, because the plan adopts the Court's pupil assignment scheme, the State Board must show that the Court's pupil assignment criteria are adaptable to the four-district system. As will be explained in detail below, the Court is satisfied that the reorganization would create four racially non-identifiable school districts, each of which is capable of continuing the 9–3 pupil assignment scheme now in effect. The Court, however, must withhold approval of the plan unless curative legislation is promptly obtained that would give the State Board authority to enforce other aspects of the Court Order that it has adopted and which are necessary to maintain a viable educational system within the former predominantly black Wilmington district.

### A.

The four-district reorganization before the Court is the response of the State Board of Education to the perceived mandate of the General Assembly that the desegregation area be reorganized. The State Board initiated the process by requesting the staff of the State Department of Public Instruction ("DPI") to prepare a plan of reorganization that would minimize disruption of students by relying on the present boundaries of the NCCSD's four Attendance Areas, while producing a reasonably equitable distribution of assessable property. Tr. B 19–20 (Grossman); D 13–14 (Nichols).

The initial proposal developed by the DPI staff quickly proved unacceptable, however, because it unexpectedly created racially imbalanced districts. Tr. B 21–22 (Grossman); D 15 (Nichols). The State Board then retained a statistician from the University of Delaware, Edward Ratledge, to analyze data relating to present and anticipated student enrollment and to assist the DPI staff in preparing a reorganization proposal that would produce racially balanced districts. Specifically, Ratledge was instructed to determine what boundary changes could be made so that by the 1982–83 school year the percentage of black students in each district would be within 2 percentage points of the anticipated percentage of black students in the four districts combined. In developing a modified four-district proposal, Ratledge and the DPI staff were also directed to seek to limit disruption by minimizing boundary changes,[56] to

55. The evidence overwhelmingly established that a unitary school system has not yet been achieved. The NCCBE's current president, also president of District 2's Interim Board, expressed the belief that problems traceable to segregation still exist. She agreed that, while progress has been made, remnants of the dual system have not yet been extirpated. Tr. J 97–100 (DiVirgilio). Many schools have produced racially identifiable or severely imbalanced classrooms. See P–4D81, Ex. 41 (1980 statistics); P–4D81, Ex. 42 (1979 statistics). Other remnants of the dual school system appear in the continued racial identifiability of some schools' faculties and administrative staffs. Tr. J 237–240 (Johnson). The evidence

also suggested a possible problem of racially disproportionate suspensions and other forms of discipline. For example, in the first year of court-ordered desegregation, 1978–79, black enrollment in NCCSD schools increased by 7.1%, while black suspensions increased by 205% as compared to 1977–78 figures. See Tr. J 25 (Grantham); P–4D81, Ex. 33 at 18–19.

56. The State Board had hoped that placing students in school districts corresponding to their former Attendance Areas would obviate the necessity of reassigning them to new schools. Tr. at B 45–46 (Grossman). Students are assigned to schools on the basis of residence. Under the 9–3 pupil assignment plan, children

make sure that each new district would be capable of implementing a 9–3 pupil assignment plan, and, to the extent feasible, to minimize differences among the districts in the assessed real estate value per pupil.

Ratledge and the DPI staff then prepared three alternative four-district proposals.[57] Each of them was based upon the Attendance Area lines of the NCCSD, with modifications made in those lines to equalize racial proportions, and to eliminate unacceptable disparities in the assessed valuation per pupil. The State Board adopted so-called Option IV on the DPI's recommendation that it satisfied the racial balance requirements and minimized disparities in assessed valuation. Option IV, which is incorporated in the Regulations of the State Board, was summarized statistically by DPI as follows:

OPTION IV

Grade 1–12 Enrollments (Excluding Special Schools) ·

| | 1979–80 | | 1980–81 | | 1981–82(Proj.) | | 1982–83(Proj.) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Enrollment | % Black | Enrollment | % Black | Enrollment | % Black | Enrollment | % Black |
| District 1 | 13,314 | 22.1 | 12,343 | 24.5 | 11,948 | 26.2 | 11,519 | 28.1 |
| District 2 | 15,326 | 26.6 | 14,373 | 27.0 | 14,129 | 27.9 | 13,914 | 28.5 |
| District 3 | 15,370 | 24.0 | 14,565 | 24.5 | 14,681 | 25.2 | 14,639 | 25.8 |
| District 4 | 10,151 | 27.9 | 9,674 | 28.7 | 9,796 | 28.8 | 9,858 | 28.9 |
| Total | 54,161 | 25.0 | 50,955 | 26.0 | 50,554 | 26.9 | 49,930 | 27.7 |

Assessed Value of Real Estate
(In Thousands)

| | 1979–80 | | 1980–81 | |
| --- | --- | --- | --- | --- |
| | Total | Per Pupil | Total | Per Pupil |
| District 1 | $752,381 | $52,640 | $762,228 | $57,483 |
| District 2 | $760,387 | $46,555 | $777,653 | $50,592 |
| District 3 | $673,362 | $40,072 | $690,192 | $43,116 |
| District 4 | $372,635 | $33,787 | $378,984 | $36,066 |
| TOTAL | $2,558,765 | $43,770 | $2,609,057 | $47,312 |

See D–SBE81, Ex. 1 at 4.

The new boundaries create four districts, each composed of former suburban school districts and a portion of Wilmington. District 3—unlike the others and unique in Delaware school-districting history—comprises two non-contiguous areas separated by some 12 miles.[58] This anomaly resulted from the necessity of pairing the distant and predominantly white Newark district with a predominantly black population to proceed through a particular series of elementary, secondary and high schools. These "feeder patterns" would be broken if children formerly in the same Attendance Area were separated from each other or from their schools by new district lines. Unlike an Attendance Area, a school district is a distinct political unit with power to assign pupils only in its own territory, unless it is authorized to use a building in another district. Broken feeder patterns mean not simply that a few children will attend new schools with unfamiliar teachers, classmates and curricula, but that extensive reassignment must be undertaken to rectify the racial balance the State is seeking to maintain in schools that receive or lose a substantial number of children. It has become apparent, however, that whatever the decision of the Court, feeder patterns will be widely broken due to the necessity of closing schools (See Tr. I 125–26 (Harrison)), and changes in Area boundaries that will occur if the single district remains in place. See Tr. I 149 (Harrison).

57. See D–SBE81, Ex. 1. Option I is the original proposal rejected by the State Board because of racial imbalances. Options II, III and IV are the alternatives developed by Ratledge and the DPI staff.

58. Joining a portion of Wilmington with the former Newark district preserves the pupil assignment pattern now in effect.

be found only in Wilmington. Tr. B 69–71 (Grossman). In great part, the proposed boundaries correspond to the lines of the NCCSD Attendance Areas. However, the old boundaries were changed in four places for purposes of equalizing racial proportions and assessed valuation per pupil. Three such moves shifted boundaries in Wilmington, while the fourth occurred in the suburbs, placing a small portion of the former predominantly white Stanton School District, all of which is in Area II, into proposed District 4. See Tr. D 19–20 (Nichols); S.B.Regs., § VI, A (P–4D81, Ex. 19 at 40).

The statistics demonstrate that school authorities achieved the desired goal; the proposed districts' student populations should be, at least through 1983, very nearly equal in overall racial composition.[59] Moreover, the evidence indicates that the drafters of the plan determined that each of the proposed districts will be capable of implementing the 9–3 student assignment pattern required by the Court Order.[60] Thus, on its face, the reorganization plan appears to create racially non-identifiable school districts that are as able as the single district to continue the educational policies required to establish a unitary school system.

More detailed demographic evidence regarding the four districts came to the Court's attention as a result of the School Closing Committee's grade-by-grade analysis of the racial characteristics of the proposed districts.[61] Because the hearing on the four-district plan had by then been completed, the Court sua sponte reopened the record to permit this information to be made part of the record evidence in the current proceedings.[62]

The information developed by the School Closing Committee caused the Court some concern because it indicated that the very nearly equal racial balances among the four districts suggested by the State Board's evidence might have been misleading. Although the Committee did not dispute the validity of the data presented to the State Board, it did analyze the racial composition of the proposed districts on a grade-by-grade basis, information that had never been presented to the State Board. That information reveals significant disparities in the racial composition of the districts when particular grades are examined. In particular, the evidence demonstrated that in the lower elementary grades (grades 1–3) proposed District 1 would have a higher percentage of minority students than any of the other three districts. See CT–4D81, Exs. 1, 2A, 3. The disparity between the anticipated minority enrollments of Districts 1 and 3 in these grades is most signifi-

---

59. It should be noted that DPI only considered the number of blacks in a particular district for the purpose of determining racial proportions. Thus, for example, the number of Hispanics in a particular district was not considered when determining whether the racial composition was acceptable. Tr. D 68–69 (Nichols).

60. Tr. D 22 (Nichols). Since the reorganization plan, for the most part, incorporates present feeder patterns, continuation of the 9–3 pattern should, not with one exception, cause any significant practical problems. District 1, because of the loss of the King School to District 4, will have to make room for the grades 4–6 students now attending the King School in other available educational facilities in the city. Although the result will be a "tight fit," testimony indicates that all students can be accommodated in the available facilities. See Tr. I 72–75 (Harrison).

61. The School Closing Committee, composed of two administrators from the NCCSD and a "consultant" from DPI, was created by the Court for the purpose of preparing school closing plans for each of the four proposed districts. Such a Committee was deemed necessary by the Court so that the four districts, if they come into being, would have available to them working documents on the subject of school closings similar to the proposal presented to the NCCSD. See Doc. Nos. 1005 and 1007.

62. That the Committee might avoid pressure from possibly divergent and conflicting parochial interests, it was permitted to receive information but "directed not to discuss any aspect of the Report with any party or with any person until further order of the Court." (Doc. No. 1007, Ex. A at 5). At the same time, all parties were assured that if the Court became aware of facts developed by the Committee which the Committee was barred from communicating to the four interim boards, the NCCBE and the State Board, a means would be devised to inform all concerned.

cant. The conclusions to be drawn from these figures are that proposed District 1's minority enrollment would increase at a demonstrably faster rate than the other three districts, and, specifically, that District 1 would have elementary grades with significantly larger minority enrollments than Districts 3 and 4.[63]

If the disparities in the lower grades develop a trend, then the differences among districts will increase. Within a single school district, flexibility in reassigning pupils could take account of these changes. Indeed, the NCCSD's work on a new pupil assignment and school closing plan represents an attempt to do just that. See P–4D81, Ex. 21A; Tr. M 51–52 (Harrison). The new four districts will not have the luxury of this flexibility. Under state law, each school district's power to assign pupils extends only to students in its territorial borders. If it desires to rectify racial imbalances, an individual district must work with its own population or seek the cooperation of other districts. This loss of flexibility in student assignment was cited by one State Board member as a reason for her personal opposition to the reorganization. Tr. B 50–51 (Grossman).

The question that the Court must decide is whether the disparities in the racial composition of the proposed districts are such as to create a material impediment to desegregation. There is no doubt that, in the context of an attempt to complete dismantling of a dual school system, a federal court may prevent a state from creating racially identifiable schools or districts. See, e. g., Wright v. Council of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). On the other hand, imposition of racial quotas must be avoided. See, e. g., Milliken v. Bradley, 418 U.S. 717, 740–41, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974) (Milliken I); Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971) (no constitutional requirement of a particular racial mix); Evans v. Buchanan, 555 F.2d 373, 380 (3d Cir. 1977) (rejecting language of decree that seemed to require 10–35% black enrollment in each grade). The line between permissible prevention of racial identifiability and

**63.** The testimony indicated that at least three factors may be contributing to this trend. First, most of that portion of the City of Wilmington assigned to District 1 has a stable black student population unaffected by the revitalization of the city. (CT–4D81, Ex. 6A). Thus, even though there has been an enrollment decline of between 13% and 14% within the desegregation area, there has been a decrease of only 1.33% (94.61% in 1978 to 93.28% in 1980) or 117 (2352 to 2235) black school children residing in District 1's portion of the City of Wilmington between February, 1978 and October, 1980. In contrast, for the same time period, proposed District 2 had a total decrease of 7.79% or a loss of 743 black children (4327 to 3584) in its Wilmington sector. (Technically these figures should be adjusted to account for a boundary change, however the principle of a stable black population in District 1's Wilmington sector remains the same.) Tr. M 34–37 (Harrison); CT–4D81, Ex. 6.

The second demonstrated demographic factor is a dramatic increase from 18.2% to 33.4% black student population in grades 1–3 in the so-called Mt. Pleasant feeder. (CT–4D81, Ex. 4). This increase reflects increased black student residence in the suburban portion of District 1. (CT–4D81, Ex. 5).

Finally, this decade old litigation, and continued uncertainty and dissatisfaction with the public school system, have exacted a special toll from proposed District 1. This area is relatively affluent and, prior to the mid 70's, attracted new white residents through company transfers of executives and highly trained scientific personnel. While many might quarrel about the reasons, none can contest the bleak facts. This form of immigration has dropped off and much of the remaining white population is aging or sending its children to private schools. (Tr. M 44–45; M 52–56).

In sum, black student residence in District 1 is holding steady in the City and increasing substantially in the suburbs, while white students are ceasing to enter or are leaving the public school system in that District. This phenomenon can be illustrated by comparing the current 12th grade, which will graduate in spring 1981, with the current first grade in District 1:

| | Black | Hispanic | Other (incl. white) | Total |
|---|---|---|---|---|
| Grade 1 | 309 | 11 | 526 | 846 |
| Grade 12 | 183 | 6 | 1090 | 1279 |

Source: CT–4D81, Ex. 1.

If the first grade is treated as a replacement of the 12th grade, District 1 will see a net loss of 433 students this spring. In racial terms, it will have 564 fewer whites, and 131 more minority students.

impermissible imposition of quotas has not been clearly drawn. Without purporting to locate that boundary with particularity, I find that rejection of the State Board's motion on statistical grounds would, in the circumstances of this case, put this Court on the wrong side of the line.

The Committee's data, calculated as if the four-district plan had been in place in 1980–81, show the worst imbalances in grade 1. First grade minority (black and Hispanic) enrollments would be approximately 38% in District 1 and 39.6% in District 2 as compared to 28.7% in District 3 and 29% in District 4. Figures for the later elementary grades show roughly similar disparities, but retreat from the high of nearly 40%. (*See* CT–4D81, Ex. 3). To hold that a 35–40% minority grade grouping in a school system roughly 30% minority as a whole constituted racial identifiability would be tantamount to adoption of the quota rejected by the Third Circuit Court of Appeals. *Evans v. Buchanan, supra,* 555 F.2d at 380. The student distribution described in this record shows no such grievous imbalance as those that federal courts have found unacceptable. *See, e. g., Wright, supra,* 407 U.S. at 457, 92 S.Ct. at 2200–2201 (rejected reorganization would have created one district 48% white and another district 28% white in desegregation area 34% white); *United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 489–90, 92 S.Ct. 2214, 2217–18, 33 L.Ed.2d 75 (1972) (prohibiting split of 78% black district into one district 43% black and another 89% black); *Ross v. Houston Independent School District,* 583 F.2d 712, 714–15 (5th Cir. 1978) (prohibiting split of desegregation area 64.9% minority which would create one district 67.3% minority and one district 10.4% minority); *United States v. Seminole County School District,* 553 F.2d 992, 993–94 (5th Cir. 1977) (racial identifiability found in school system 15% black where 1 school remained 98% black and 15 others were 97.8–99.86% white). As to the issue of present racial identifiability, the four-district plan passes muster.

An equally important, but more subtle, issue concerns the future path of desegregation. While the proposed districts may not appear racially identifiable when considered as entire school systems, the Court is very concerned that disparities among districts at specific grade levels might cause District 1 to be regarded as "black" and be avoided by whites with elementary or pre-elementary age children. The Committee's grade-by-grade breakdown suggests the potential for white flight. In the 1980–81 second grade, for example, the districts' minority percentages would vary by as much as 6.6% from the overall ratio if the four-district system were in place. *See* CT–4D81, Ex. 1, at 1. It is arguable that a white family moving into New Castle County might choose to live in a school district where lower elementary grades are roughly one-quarter minority (District 3) rather than a district (District 1) with nearly one-third minority enrollment in those grades. However, it would be speculative and unwarranted to conclude on the present record that there will be white flight from, or refusal to migrate into, District 1 at levels sufficient to produce racially identifiable school districts.

I have no doubt that a reorganization that purported to establish a unitary school system yet fostered clearly demonstrable trends toward resegregation should be rejected as frustrating desegregation. This record offers no such clear demonstration. There was no testimony that the problems identified by the Committee would in and of themselves actuate white flight. Indeed, the Committee witnesses scrupulously disclaimed pretensions to demographic expertise, and properly declined to state, on the basis of their three-year data base, that any proposed district is likely to become a minority enclave or a safe haven for whites. Their remarks were limited to the personal opinion that, if current statistics develop into a trend, District 1 will have the highest black enrollment. *See* Tr. M 46–47 (Harrison); M 102 (Cleland); M 104 (Nichols).

■ The Court is compelled to conclude that the racial composition of the proposed districts does not constitute an impediment to desegregation. Although the four districts may soon lose the very nearly equal racial ratios sought by the State Board, there is no constitutional basis for requiring that the new districts racially mirror each other. Nor is there any evidentiary basis for concluding with any certainty that white flight, or any other form of resegregation, will soon occur if the desegregation area is reorganized according to the State Board's plan.[64]

### B.

Plaintiffs have isolated a number of substantial problems in the school system that have not been addressed in the reorganization plan. Because the Court is of the view that the State Board need not, as a predicate to reorganization, act to correct all problems stemming from the historic pattern of segregation, plaintiffs' claims must be rejected.

Plaintiffs point, for example, to evidence of a number of problems that may be characterized as vestige effects of de jure segregation. These include resegregation in classrooms apparently caused by ability grouping and tracking, racially disproportionate discipline rates, and schools that are racially identifiable by reason of the pattern of assignment of teachers and administrators. The Court recognizes that these are very real problems that need to be addressed, regardless of the organizational structure of the school system. The Court has not seen any evidence, however, that transition to a four-district system would make these problems any better or worse. Quite simply, the question whether the State Board may create four independent school districts is independent of the questions who should act and what should be done to rectify continuing problems associated with the desegregation process.

Plaintiffs also cite two problems with pupil and staff assignments which, they argue, create impediments to desegregation: (1) the plan contains no provision for the nondiscriminatory pupil and staff assignment plan that will be necessary if the anticipated school closings occur; and (2) it adopts "9–3" as an inflexible pupil assignment standard. Both of these problems have been substantially eliminated. First, the Court, on February 12, 1981, appointed a Pupil Assignment and School Closing Committee. See Doc. Nos. 1005 and 1007. By late April this Committee will provide each interim board with a working document to serve as the basis for a nondiscriminatory pupil assignment and school closing plan in each of the proposed districts.[65] This time sequence is not appreciably behind that which was successfully followed in 1978. Second, on March 25, 1981, the State Board gave notice that its Regulations had been amended to make the 9–3 pupil assignment criterion a minimum standard for utilization of schools in the former predominantly black districts rather than an absolute requirement. See Doc. No. 1035. Thus, to the extent that plaintiffs' claims in this regard may have had merit, they have since been corrected.

**64.** The District 1 School Board, concerned about the disproportionate increases in minority enrollment in the lower grades in proposed District 1, has requested the Court to order the State Board to finance and implement a "comprehensive study of demographic trends within the desegregation area." Doc. No. 1031 at 6–7. Counsel for District 1 concedes, however, that the racial dissimilarities of the proposed districts are not so great as to imperil desegregation. Tr. N 99–100. In view of the Court's similar conclusion, it is simply inappropriate for the Court to intrude into educational administration and require such a study when it is not necessary in order for the Court to perform its constitutional function. The request will therefore be denied.

**65.** The Court will not review such plans as the districts may eventually adopt provided they are consonant with the criteria of the 1978 Order adopted in the Regulations (S.B.Regs., § VI B (P–4D81, Ex. 19 at 41)) and do not diminish the current level of suburban students' attendance at the 1–3, 7–9, and 10–12 grade levels in the City of Wilmington. See Evans v. Buchanan, 447 F.Supp. 982, 1008 (D.Del.), aff'd, 582 F.2d 750 (3d Cir. 1978). Further discussion of this issue appears at 866–867 infra.

Another series of objections raised by plaintiffs relates to alleged problems that will result from the creation of autonomous school districts, and especially from the splitting of Wilmington into four separate political units. Plaintiffs claim, for example, that the presence of four separate school administrations and curricula will cause disruption in the provision of educational services to the predominantly minority and highly mobile residents of Wilmington, and that reorganization will break up the leadership in the Wilmington minority community. The Court assumes that students and parents in Wilmington will incur these disadvantages if the reorganization is implemented, but finds that it is not a basis for rejecting the reorganization plan. All parties agree, and the evidence demonstrated, that the desegregation area could not have been reorganized into multiple districts without somehow dividing Wilmington. Whatever disruption may befall Wilmington residents as a result of reorganization, there is no basis for concluding that it would perceptibly impede the desegregation process. In short, the burden placed on Wilmington residents is simply one of the unavoidable costs of the State of Delaware's exercise of its prerogative to determine the organizational structure for governance of its public schools. Similarly, the Court rejects plaintiffs' claim that creation of the four proposed districts will limit the ability to provide ancillary relief and to follow the pupil assignment criteria required by the desegregation decree. The four proposed districts are capable of developing nondiscriminatory pupil assignment patterns and providing any ancillary relief that is required by this Court's orders.

Plaintiffs' final claim is that the reorganization plan is defective because it lacks any coordinating authority or enforcement mechanism to resolve disputes among the districts regarding implementation of the pupil assignment criteria developed by the Court for the single district and made binding on the four districts by the State Board's Regulations. This claim gives rise to considerable concern and will be discussed in detail in the following section.

## C.

The Court has determined that each of the four proposed districts is capable of independently implementing a pupil assignment plan that conforms to the minimum 9–3 requirement,[66] and assumes that each would honor its obligation to do so. As will be explained below, however, the plan cannot be approved without curative legislation because it creates substantial practical obstacles to the enforcement of rights of plaintiffs recognized in the decree and, if implemented, would lead to unnecessary involvement of this Court in matters of educational policy that are properly left to state and local authorities.

### 1.

This Court's January 9, 1978, desegregation order required the NCCSD to develop a pupil assignment plan based upon a 9–3 scheme for reassignment of students.[67] In addition, the Court required that two additional elements be included in any specific student assignment plan developed in accordance with the 9–3 requirement: (1) That a full 1–12 grade span be maintained within the City of Wilmington, (2) that at least one of the three high schools in the predominantly black former Wilmington and DeLaWarr districts be utilized as a 10–12 grade center. The State Board has, by regulation, expressly adopted these requirements.[68] Although the Court finds the

---

66. See note 60 *supra*.

67. It will be remembered that the so-called 9–3 plan calls for all students to attend schools located in former predominantly white districts for nine years and schools located in former predominantly black districts for three years. *See supra* at 843.

68. The State Board Regulations provide as follows (P–4D81, Ex. 19 at 41):

B. *Order of The Court Incorporated*
 The Order of the Federal Court relating to pupil assignment is the rule of the State Board. Therefore, the following pertinent [sic] parts of the Order are quoted in part and shall be binding on the four new districts.
 1—*9–3 Required By Court Order*

State Board's intentions laudable, serious practical problems are likely to arise when criteria designed for a single district are applied without modification to a four district system. The Regulations make the Court's grade span and Wilmington high school requirements "binding" upon the four districts, but make no provision for allocating that responsibility among the districts. That is, the plan does not require *each* district to maintain a 1–12 grade span, but follows the Order literally, simply mandating that a full grade span be achieved through some unspecified combination of educational facilities among the four districts. Similarly, the Regulations do not require any particular district to use a high school located in a former predominantly black district as a 10–12 grade center, but only that at least one of the districts use one of the three available high schools. In effect, the Regulations establish a "joint and several" obligation among four independent districts to follow the Court's order. Each district, however, is authorized to develop any pupil assignment plan consistent with 9–3 and to determine what school facilities will be utilized.[69] When this facet of the plan is analyzed, the potential problems quickly become evident. Suppose, for example, that each of the districts, as is their right, concludes in good faith that its constituency strongly prefers that it not maintain grades 1–3 in Wilmington. Who then is to decide which district *must* open grades 1–3 in Wilmington so that there will be compliance with the Court decree? The answer is unclear at best. The plan provides no cooperative mechanism by which the districts may resolve a disagreement over which district should assume responsibility for satisfying a particular component of the decree.

The State Board argues that it has the power under Delaware law to ensure compliance with the Court order. The scope of the State Board's authority, however, is far from certain. What is certain is that there are substantial legal questions left unresolved by the State Board's plan and these legal questions will in time imperil enforcement of the decree and unnecessarily require the Court to intrude into areas of educational policy. However, before considering the ramifications of an impasse among the districts, it is necessary to discuss why the Court is confident that such an impasse will occur.

2.

The requirements that a full grade span be maintained in Wilmington and that a high school in a former predominantly black district be utilized were initially mandated because the Court concluded they were necessary to achieve the constitutional objective of desegregation and because they were essential to any remedy that would do justice to plaintiffs. These components were imposed after the Court became convinced that a 9–3 requirement, standing alone, would lead to a pattern of pupil assignments in which only grades 4–9 would remain open in the predominantly black districts. *See Evans v. Buchanan, supra,* 447 F.Supp. at 1002–08. In evaluating the 10–2 plan that was eventually rejected, the Court made the following observations:

> Additional considerations further imperil the 10–2 concept. Credible testimony to the effect that the primary and

'The Board and its successor is authorized and empowered to implement commencing September, 1978, a pupil assignment plan which reassigns all students from the geographic area of the predominantly black districts (Wilmington and DeLaWarr) to the geographic area of the predominately white districts (Alfred I. duPont, Alexis I. duPont, Claymont, Conrad Area, Marshallton-McKean, Mount Pleasant, New Castle-Gunning Bedford, Newark and Stanton) for nine years and all students from the geographic area of the predominantly white districts to the pre-

dominantly black districts for three consecutive years (9–3).

'The 9–3 pupil assignment plan as implemented shall contain a full 1–12 grade span within the City of Wilmington and at a minimum shall utilize one of the three high schools of the predominantly black districts as a 10–12 grade center.'

69. *See* Defendants' Pre-Trial Findings of Fact and Conclusions of Law (Doc. No. 979) unnumbered page 11.

high school grades are perceived as the most important grades indicates that the less important grades were assigned to the predominantly black districts. Concern was intimated over the prospect of children from the predominantly white districts travelling to school by bus in the primary grades; the worry was obviated by the expedient of assigning all children from the predominantly black districts to travel to the predominantly white districts during those years. No mention was made that the parents of those children from the predominantly black districts might be equally concerned about their children's transportation in the early years. Also, failure to reassign any child in the predominantly white districts for grades 1–4 or for the high school years necessarily reduces the number of grades which the former black schools can offer. Moreover, plaintiffs point out that with a surplus capacity in the county as a whole, severe underutilization of the city schools will inevitably target them for closing. Arguably, these anticipated school closings, the conversion of the Wilmington high schools to grade centers, and the attendant demise of the Wilmington high schools as high schools will both identify the formerly black schools and create widespread misapprehension that something was wrong with the formerly black schools in the first place. . . . [T]he negative impact of such misconceptions upon both black students generally and white students assigned to these schools will have a deleterious effect upon the entire effort to desegregate.

447 F.Supp. at 1002–03 (footnotes omitted). These considerations persuaded the Court that additional elements needed to be added on to the 9–3 requirement in order to create a remedy that would be constitutionally effective and would not require plaintiffs to bear an undue share of the burdens of desegregation.

Subsequent events have shown that the Court's concerns in 1978 were well-founded and the Court is now convinced that there would be neither a high school nor any 1–3 or 7–9 grade centers in Wilmington today but for the special components of the desegregation order. The New Castle County Board of Education, with the acquiescence of the State Board, responded to the exigencies of desegregation by closing two of the three minority high schools, while closing only one (Conrad) of the thirteen former predominantly white high schools.[70] That same school board has produced an even more unsettling pattern of pupil assignments. Of all students living in former predominantly white districts and attending schools in the former predominantly black districts, 80.4% are enrolled in grades 4–6. By contrast, 7.3% of those students are in grades 1–3, 5.4% in grades 7–9, and 6.9% are in grades 10–12.[71] These figures demonstrate that the New Castle County School Board, all of whose members serve on the interim boards of the proposed districts, has succeeded in keeping almost all of the students who live in the former predominantly white districts "at home" for those grades deemed most important or sensitive.[72] This

---

**70.** The closed high schools continue to be used to house lower grades.

**71.** Source: CT–4D81, Ex. 4 and calculations made therefrom. Students in the Alexis I. duPont and Marshallton-McKean feeder patterns attend schools in the former Wilmington district for grades 1–3; students in the Alfred I. duPont, Mt. Pleasant, Stanton, Newark and New Castle-Gunning Bedford feeder patterns attend former Wilmington or DeLaWarr district schools for grades 4–6; students in the Claymont feeder pattern attend Wilmington schools for grades 7–9; and students from the Conrad feeder pattern attend Wilmington High School for grades 10–12. *See also* P–4D81, Ex.

21; Tr. I 22–25, 66–68, 143–44, 189–91 (Harrison).

**72.** The pattern is especially startling when actual numbers are considered. 622 of the 7984 students in grades 1–3 who live in former predominantly white districts now attend former predominantly black schools. 455 of the 9999 students in grades 7–9 who live in former predominantly white districts now attend former predominantly black schools. 590 of the 10,-717 students in grades 10–12 who live in former predominantly white districts now attend former predominantly black schools. By contrast 6833 of the 8966 students in grades 4–6 who live in former predominantly white dis-

pattern of course requires assignment of greater numbers of students from the former predominantly black districts during those years, even though black parents may consider the lower school grades or the high school grades just as important to their children. The effect of this pupil assignment plan is that, except for grades 4–6, there remain in the City of Wilmington only the bare bones of an educational system: Of the 11618 students now attending schools located in the former predominantly black districts, 9053 are concentrated in grades 4–6.[73] These bare bones remain only because of the requirements in addition to 9–3 imposed by the Court on the New Castle County School District.

If the four-district plan is implemented, the pressures that produced the above student assignment pattern will be intensified. Instead of developing policy that is in the interest of the whole desegregation area, the four autonomous school boards will soon act out of concern for purely parochial interests. Probably sooner than later, the districts would realize that neither the Court order nor the State Board Regulations require any particular district to maintain any specific school facilities. Eventually, one of the districts would conclude that it was time that another district should take on a Court imposed responsibility perceived as being particularly onerous. The unknown is at this point not *if* the districts will reach an impasse, but simply *how soon* after final adjudication that impasse will occur.

### 3.

In view of the conclusion that a dispute is sure to arise among the districts, it is necessary to consider the implications of such a dispute. If there exists a swift and sure means of resolving such an impasse in a manner consistent with the Court's decree, the absence of an express procedural device is not a fatal flaw.

The State Board, while reaffirming the right of the local boards to assert control over the assignment of students and the utilization of school facilities, takes the position that it has the power to ensure that the four districts comply with the Court's order. The issue of the State Board's power can best be framed in terms of a hypothetical example. If each of the four districts decided to maintain only grades 4–6 in Wilmington, would the State Board then have the authority to order various districts to open enough grades so that the 1–12 grade span would be satisfied? The State Board's authority is at best dubious.

Before examining the various sources of authority that might give support to the State Board's position, it is instructive to look back to 1978, when the State Board sought to implement a similar four-district plan. Interestingly, that plan, unlike the one now before the Court, included a regulation which created a coordinating mechanism requiring the four districts to submit to the State Board for its approval pupil assignment plans which would "collectively comply" with the Court Order.[74] At that

---

tricts now attend former predominantly black schools. Source: CT–4D81, Ex. 4 and calculations made therefrom. (CT–4D81, Ex. 4 understates the number of students in the Newark feeder pattern in grades 7–9 and overstates the number of those students in grades 10–12. This error is present because Newark maintains 7–8 grade centers and four year high schools. The above calculations were adjusted to compensate for the exhibit's erroneous depiction of the grade distribution of students in Newark).

Significantly, only four of the nine former predominantly white school districts—Claymont, Alexis I. duPont, Conrad, and Marshallton-McKean—now send students into the disfavored grade spans (1–3; 7–9; 10–12).

73. Source: P–4D81, Ex. 21 and calculations made therefrom.

74. *See* 1978 Four District Reorganization Plan (P–4D81, Ex. 25) at 15:

*Assignment of Pupils.* Each reorganized school district shall prepare a pupil assignment plan in compliance with the Order of the Court. The State Superintendent of Public Instruction shall convene a council of the four superintendents of schools for the newly created school districts and through this council assure coordination of the pupil assignment plans throughout the four districts and seek insofar as practicable to utilize the pupil assignment plans already developed by the Court authorized committee for pupil assignments. The plan developed through this

time, however, even with a coordinating mechanism, counsel for the State Board took the position that the State Board did not have the ultimate authority to resolve a dispute among the districts regarding which district must maintain certain educational facilities required by the Court Order. Instead, counsel's solution was to have this Court resolve disputes among districts as to which city schools should be kept open.[75] Ultimately, the Court enjoined implementation of the 1978 Four District Plan, in part because "no sure method exist[ed] to compel one district to coordinate with another and no vested authority [was] empowered to resolve the impasse if no district [was] willing to exchange its primary school or high school students with those of the predominantly black districts." 447 F.Supp. at 1049 (footnote omitted). This history causes one to wonder why the State Board in the current plan failed to address the problem of resolving disputes among districts when it so clearly must have been aware of it.[76] Has the State Board been vested with authority that it lacked in 1978? Or, instead, were the Court and counsel for the State Board wrong in their reading of the law in 1978?

The obvious starting point in considering whether the State Board has the statutory power to compel the proposed districts to comply with the Court's decree is S.B. 593, the enabling legislation for the reorganization plan. That law gives the State Board the power, in accordance with specified criteria, to "divide any school district created by order of a federal court...." 14 Del.C. Ann. § 1028(k) (Michie Supp. 1980). The Delaware Supreme Court had occasion to examine S.B. 593 in December 1980 when it responded to a request from the Governor of Delaware for an advisory opinion regarding the validity of the law under the Delaware constitution. In considering whether the bill impermissibly delegated legislative power to the State Board, the Court observed that the intent of the General Assembly was to give the State Board of Education "the flexibility to create smaller, locally controlled districts, satisfying any constitutional demands [of this Court] and conforming as consistently as possible with existing statewide educational policy...." Opinion of the Justices, 425 A.2d 604, 608 (Del.1980). The State Board would have the Court read this language to mean that S.B. 593 gives the State Board whatever power is necessary to ensure that any newly created districts in the desegregation area comply with the Court's remedial decrees. This power can then be exercised by adopting appropriate regulations pursuant to 14 Del.C.Ann. § 122(a), which authorizes the State Board to adopt rules and regulations "for the maintenance, administration, and supervision ..." of the Delaware public schools.[77] Moreover, it is established that any duly promulgated regulations of the State Board have the force of law. See Steiner v. Simmons, 111 A.2d 574, 583 (Del. 1955). The State Board then points out

council shall be presented to the State Board of Education for approval no later than March 31, 1978. State Board approval will be granted when the plans of the four districts collectively comply with the specifications of the Court in regard to the "9–3" placement of pupils and the maintenance of the grades K–12 in school buildings within the City of Wilmington.

In view of the uncertain scope of the State Board's authority over pupil assignments, it is highly questionable whether such a regulation would cure the defects in the present plan. See infra at 868–871.

75. See Doc. No. 752 at 21–26. By contrast, Dr. Row took the position at that time that the State Superintendent of Education had "final authority to insure that the grade span is maintained as required." Doc. No. 740 at 7. Dr.

Row, however, apparently is now not of the view that the State Board or the State Superintendent is authorized to resolve disputes among districts. See note 79, infra.

76. The Court takes note that the State Board Regulations do authorize the State Superintendent to resolve some relatively noncontroversial disputes among the districts regarding staffing. See P–4D81, Ex. 19 (Doc. No. 956) at 45, 47.

77. S.B. 593 expressly provides that any Rules or Regulations adopted in connection with a reorganization "shall be binding upon the parties involved in accordance with § 122(a) of this title." 14 Del.C.Ann. § 1001(b) (Michie Supp. 1980).

that the school districts are obligated to comply with the Court's decree because that decree is incorporated in the State Board's Regulations.

The Court is satisfied, based upon the advisory opinion of the Delaware Supreme Court, that the State Board was authorized to adopt regulations imposing the student assignment criteria upon the four districts.[78] Indeed all parties agree that the districts would be bound by requirements of the decree incorporated in the plan. The difficult question is, however, in the event of an impasse, who makes the politically and emotionally charged decision about what districts must maintain what grades in the City of Wilmington. It is one thing to say that the State Board may impose the pupil assignment criteria upon the districts. It is quite another thing to say that the State Board has the power to determine *how* the local districts will comply with the decree. If, for example, the four districts were unable to agree upon which of the districts must maintain a 1–3 grade span in Wilmington, the State Board, if it were to resolve the controversy, would need the

power to direct one of the districts to open those grades in the city. In so doing it would be ordering a district to reassign some of its students and, in all probability, requiring the opening and closing of school facilities.

The State Board argues that the reorganization legislation gives it a continuing supervisory power to ensure compliance with the desegregation decree even though the law, on its face, speaks only of regulations and rules needed to implement the reorganization and create new school districts. *See* 14 *Del.C.Ann.* § 1001(b) (Michie Supp. 1980). The testimony, however, made clear that pupil assignment and school closings are functions traditionally reserved to local school boards. Both the State Superintendent of Public Instruction and the Assistant State Superintendent for Auxiliary Services were unsure whether the State Board possessed the power needed to compel implementation of a pupil assignment plan that would satisfy the requirements of the decree and thought that legislation might be needed.[79] As noted by the

---

**78.** The Delaware Supreme Court noted that the overwhelming consideration of the General Assembly was to authorize the State board to adopt "a plan that would satisfy the constitutional demands of the United States District Court and all that that implies. In particular, the plan must adequately desegregate the student body." *Opinion of the Justices, supra,* 425 A.2d at 607.

**79.** The testimony of Dr. Keene, the State Superintendent, included the following (Tr. F 77–79):

> Q Well, do you have any power to make a local Board do something about assignments in particular school buildings?
> A We would prefer to go on the concept that has existed in the past, and that is the one that decisions of that nature should be made at the lowest possible level and that they should be made in the local School District. If they do not close schools or do other things, I am sure that the State, if it requires legislation, I think that we would be willing to go to the State Legislature and propose that such legislation be enacted to give the State Board that authority, if it does not have it at the current moment.
> \* \* \* \* \* \*
> Q My question to you was, does the State Board have authority with respect to the actions of a District in assigning or not assign-

ing students to particular school buildings. You gave me a general answer that if you didn't have authority, you would certainly consider going to the Legislature to seek it. My question now on board is, is it your view that you presently have such authority?
> A First of all, I believe that the State Board has a great deal more authority than it presently finds necessary to exercise. As a response to that question I would suggest that I would refer that to legal counsel to find out just what authority we would have to do that.
> Off the top of my head I can't really give you a 'Yes, we have the authority to do such things,' but I do know that the State Board has considerable more authority than it has bothered to exercise.

Dr. Row's testimony included the following colloquy (Tr. G 127–28):

> Q But how do you resolve these conflicts between Districts as to which portion of the responsibility for the Order, for the operation of schools, should fall to the individual District and which one should be borne by the brother or sister District, as the case may be?
> A You resolve those conflicts one at a time by negotiation, by persuasion, the legal advice, and, if necessary, as Dr. Keene indicated, litigation. This is part of what it is all about. You have a goal, and the question is

Delaware Supreme Court, the enabling legislation for this reorganization reflected the General Assembly's "overriding and explicit concern 'to preserve the historic concept of semi-autonomous locally controlled school districts throughout the State' ...." *Opinion of the Justices, supra,* 425 A.2d at 607. Finally, and inexplicably, counsel argues that this legislation gives the State Board enforcement powers, when counsel argued in 1978 that substantially similar legislation[80] did not. In short, the State Board asks the Court to conclude that the General Assembly implicitly made a fundamental alteration in the traditional allocation of authority between the State Board and local school districts. The uncertain future of this argument was driven home when counsel for proposed Districts 2 and 4 was unwilling to concede at oral argument that the State Board possessed the power to order schools opened to ensure compliance with the Court Order.[81]

Reference to other statutory provisions does not solve the problem. The State Board does have broad power to establish education policy, and, by regulation, to set standards in such areas as school curriculum, instructional materials, teacher qualification, school facilities and academic degrees. *See* 14 *Del.C.Ann.* § 122. However, as noted above, pupil assignment has always been considered a uniquely local function and has never been the subject of State Board control. It is doubtful that this section would give the State Board the power to direct that a district must reassign some of its students to another school. At first blush, 14 *Del.C.Ann.* § 121(7), which authorizes the State Board to decide controversies and disputes involving the administration of the public schools, would appear to

alleviate the Court's concern. Yet surely the Legislature never contemplated that this provision would be used to settle parochial disputes among autonomous school districts as to which one should bear the burden of a "joint and several obligation" to maintain a particular educational facility. Moreover, as noted above, the exercise of such powers by the State Board would be an intrusion into a matter of sensitive educational policy traditionally committed to local school authorities. Notably, the State Board has not relied upon this statutory provision as a basis for its purported power to compel compliance. Finally, although the State courts have not offered any guidance on the meaning of section 121(7), one may fairly assume that the State Board would be required to use this authority to resolve disputes in a manner consistent with general state educational policy. There is, however, no State policy upon which the State Board could base a reasoned decision about which school district must, for example, maintain grades 1–3 in the City of Wilmington. The effect would be that the State Board would be in the awkward position of having to make an arbitrary decision about which school district must bear the responsibility of ensuring joint compliance with this Court's decrees.

This Court, however, need not, and indeed cannot, definitively determine the scope of authority of the Delaware State Board of Education. That determination lies with the courts of the State of Delaware. What is important for present purposes is that there is sufficient uncertainty in the statutory framework for this Court to conclude that the Delaware courts might ultimately determine that the State Board lacks the authority to direct local districts

not whether it will be reached but how it will be reached, and all the things you mention are little pieces of how, and each one must be dealt with on a daily or hourly basis, the goal being to have youngsters in school next September in a plan that provides for the desegregation called for with the original Order.
 Q How are you going to get it done if we have to go, as Dr. Keene suggested, in litigation, and one District just won't go, wants to appeal and fight all the way? How are you

going to get it done and operate schools in a desegregated manner in September?
 A By pushing and trying and asking people in good faith to dig in and do what is to be done. That may sound naive, but it has been done before.

**80.** *See* School District Reorganization Act of 1978, Ch. 210, 61 Del.Laws 668 (1978).

**81.** Tr. N 110–14.

to assign specific grades to specified schools within any one district. If that possibility were to materialize there would exist no means in the Delaware public education system to guarantee implementation of the grade span and high school requirements of the Court's decree embodied in the State Board's Regulations.

4.

Even if the process within the Delaware educational system for enforcing the decree should break down, however, there would still exist means to protect plaintiffs' rights. First, if the Delaware state courts determine that the State Board lacks the requisite authority over pupil assignment, this Court could perhaps confer that authority upon the State Board pursuant to the Court's equitable powers to devise an effective remedy. Second, this Court could resolve any impasse by amending its decree so as to impose specific pupil assignment requirements upon each of the four districts. Both of these options are unacceptable because they would require unwarranted and unnecessary federal judicial intrusion into matters of uniquely state concern. While altering the power structure in a state education system might be justified if absolutely necessary to redress a constitutional wrong, a federal court should not place itself in the position of having to take such drastic steps as a result of defective state legislation. Similarly, it is singularly inappropriate for a federal court to resolve emotionally charged and politically sensitive questions of pupil assignment and school closings that are best left to local officials directly responsible to the electorate and the taxpayers.

The Court is therefore compelled to conclude that the reorganization scheme endangers continued enforcement of those aspects of the Court's pupil assignment requirements designed to ensure that a viable educational structure remains in place in Wilmington. The final question is whether this defect in the reorganization scheme should affect the Court's determination of the State Board's motion. The State Board would take the position that this shortcoming in the legislation should not prevent implementation of the four district reorganization:

It has been and remains the legal position of the State Board of Education that even if only the "9-3" aspect of the Court's 1978 pupil assignment plan remains subsequent to division and reorganization, the motion of the State Board now pending before the Court should be granted nonetheless. In other words, the full 1–12 grade span and the Wilmington City high school provisions of the Court's earlier orders are not perpetually requisite in order to achieve a racially nondiscriminatory unitary school system.[82]

The Court disagrees. The time for debating the merits of the Court's 1978 desegregation decree has passed. The State Board has incorporated these aspects of the decree into the reorganization plan and did not seek to present evidence of any changed circumstances that would justify changing the Court's decree, except insofar as necessary to permit the four proposed districts to replace the single district created by the Court. There can be no doubt but that plaintiffs are entitled to have the decree "obeyed in spirit as well as in letter ..." unless and until the Court is persuaded that it should be modified or vacated. *Harthman v. Witty*, 480 F.2d 337 (3d Cir. 1973).

In addition to the specific requirements of a binding court order, there are other compelling reasons for the Court to be absolutely certain that the defendants scrupulously adhere to the pupil assignment criteria. The evidence relating to pupil assignment patterns in the single district, in the face of an unambiguous court order, compels the conclusion that the four districts, if given the opportunity, would probably maintain no more than grades 4–6 in the City of Wilmington. Although such a pupil assignment pattern would technically satis-

**82.** Letter Memorandum to the Court from Roger A. Akin, Deputy Attorney General, dated March 30, 1981 (Doc. No. 1038) at 2.

fy the requirements of 9–3, it would have a substantial deleterious effect on the constitutionally mandated transition to a unitary school system. The racial tension and divisiveness that would result would seriously imperil desegregation.

This Court believes now, as it has throughout this litigation, that what is needed is a definitive and comprehensive political solution to the problem of creating a racially neutral system of schools in Northern New Castle County. It is therefore with some reluctance that the Court cannot at the present time grant the State Board's motion. As discussed above, the plan of reorganization developed by the political institutions in Delaware is in substantial part compatible with the ongoing process of desegregation. Therefore, if the General Assembly truly desires a four district reorganization at this time it can readily achieve that objective by timely passing legislation that would cure the deficiencies in the plan noted by the Court. The Court will defer entry of a final order on the State Board's motion to give the General Assembly the opportunity to consider such legislation, if it so desires.

The Court is well aware that denial of the State Board's motion for modification of the desegregation decree so as to permit the four district reorganization would constitute significant federal judicial intrusion into state political processes. On the other hand, to grant the State Board's motion, without requiring the needed curative legislation, would eventually require an even greater degree of federal judicial intrusion in the form of this Court's involvement in questions of student assignment and the opening and closing of schools. If the Court could correct the defects in the reorganization plan without treading on ground where the federal courts do not belong, it would readily do so.

The Court realizes that its decision will mean continued uncertainty over whether there will be one district or four districts in September. This uncertainty will no doubt distress many students, parents, teachers, administrators, and taxpayers who have been subjected to tremendous confusion and disruption in recent years. In addition, planning for the next school year will be severely burdened as school officials try to prepare for both a four district system and a single district system. It is therefore necessary to establish a firm date by which the uncertainty will be resolved. Accordingly, entry of a final order will be deferred until no later than June 9, 1981, in order to afford the General Assembly an opportunity to enact, and the Governor to sign into law, legislation that would vest in the State Board all powers necessary to ensure that local districts comply with the Regulations of the State Board relating to pupil assignment and ancillary relief.[83] Whatever the General Assembly and the Governor determine to do, they are strongly encouraged not to wait the full sixty days, but to move as quickly as possible in the interest of all citizens.

Entry of a final order on the State Board's motion will be deferred until the occurrence of the first of the following events:

1) Defendant State Board files an appropriate pleading that curative legislation has been passed and signed into law and defendant State Board or any other party requests entry of a final order. In this event, the parties shall confer upon the form of an appropriate order, and, if they cannot agree, each shall present their own proposed form of order on notice.

2) Defendants State Board, State of Delaware, and Interim District Boards 1, 2, 3 and 4 all file appropriate pleadings indicating they do not wish to pursue

---

**83.** *Cf. Scott v. Germano,* 381 U.S. 407, 409–10, 85 S.Ct. 1525, 1526–27, 14 L.Ed.2d 477 (1965) (directing district court to give state authorities opportunity to develop timely reapportionment plan); *Evans v. Buchanan,* 555 F.2d at 381 (granting state authorities sixty days within which to file report of efforts to reorganize New Castle County school districts); *Avens v. Wright,* 320 F.Supp. 677, 686 (W.D.Va.1970) (retaining jurisdiction for 90 days to permit state officials to correct reapportionment plan).

passage of curative legislation or that such efforts have failed and request entry of a final order.

3) The expiration of 60 days without the filing of an appropriate pleading pursuant to 1 or 2 above.

## VI. *INTERVENING HISPANIC PLAINTIFFS' CLAIM*

Intervening Hispanic Plaintiffs raise a claim analogous to the problems of the enforceability of pupil assignment requirements just discussed.[84] They argue that eligible Hispanic students' access to a bilingual education is jeopardized by a conflict between the Regulations and a state statute.

The Regulation in question[85] requires District 2 to house and administer the bilingual program originally established in the 1978 decree by consent of the parties.[86] To permit enrollment of eligible pupils not resident in District 2, the Regulations bind the affected districts to exercise their statutory powers to provide for student transfers and to raise the necessary tuition payments. The statutory reference appears to contemplate section 602(a):

[N]o pupil shall be transferred from 1 school district to another school district without the written approval of the school board of both the sending and receiving districts. A reorganized school district receiving any pupil who is a resident of another reorganized school district shall collect a tuition charge for the nonresident pupil. Such tuition charge shall be paid by the school board of the reorganized school district in which the pupil is a resident from the proceeds of a local tax which shall be levied for this specific purpose.

14 *Del.C.Ann.* § 602(a) (Michie Supp. 1980).

The question that arises is whether the Regulation's direct mandate to approve bilingual students' transfers is a proper exercise of the State Board's regulatory power or an unenforceable violation of the local districts' statutory prerogative. Counsel for the State Board argued that S.B. 593, the reorganization enabling act, expressly "reaffirms" the State Board's general regulatory power under 14 *Del.C.Ann.* § 122(a) (Michie Supp. 1980) and so permits all regulations tailored to the remedial decree despite the apparent limitation of section 602(a).[87] It is also possible that the transfer

**84.** *See* Answering Brief of Intervening Hispanic Plaintiffs on the Motion of the Defendant Delaware State Board of Education for Modification of Prior Orders at 3–6.

The brief raises other issues which will not now be addressed. 1) It is claimed that the bilingual program is threatened by possible loss of federal funds and possible inability to procure state or local financing. This prospect is too speculative for present consideration. 2) It is urged that disciplinary codes adopted by the new districts and lay-off procedures followed by them be properly attentive to the needs of bilingual students. Such concerns are perfectly legitimate. They should be addressed to the local districts and to the State Board if reorganization takes place.

**85.** Section VII B of the Regulations (P–4D81, Ex. 19 at 42) provides:

The pupils of Hispanic background who are in need of bilingual education programs shall not suffer on account of the division of the NCCSD. Hispanic programs in place on the date of the adoption of this Plan by the State Board of Education shall continue and shall be administered by new District II. The attendance of pupils enrolled in such programs

who do not live in the district where such programs are offered shall be facilitated by tuition payments pursuant to 14 *Del.C.*, Ch. 6. The inter-district sharing of these programs shall continue under the administration of District II until such time (if any) as the new districts demonstrate to the State Board of Education that an alternative arrangement is feasible.

The superintendents and the interim boards of the proposed districts shall ascertain the number and school district of residence of participants in the Hispanic Bilingual Program and shall, not later than June 1, 1981, complete the necessary exchange of data and resolutions under 14 *Del.C.*, Ch. 6 to authorize the transfer of such students for the school term beginning September 1981.

**86.** *See* P–IH81, Ex. 1 (detailing the bilingual program adopted by the NCCSD and subsequently appended to the January 9, 1978, Order (Doc. No. 699 at 10)).

**87.** S.B. 593 provided, in pertinent part:

Any plan or rules and regulations duly adopted in accordance with this subchapter . . . by

requirement is a proper exercise of the State Board's authority to pass regulations "[g]overning the admission of pupils from the schools of 1 district to the schools of another district." 14 *Del.C.Ann.* § 122(b)(9). Aligned against this position are 1) Delaware State Court *dictum* noting that local districts' power to withhold authorization of pupil transfer "is couched in absolute terms." *Mount Pleasant School District v. Warder*, 375 A.2d 478, 482 (Del. Super.1977); [88] 2) section 122(a)'s requirement that regulations be "consistent with the laws of this State"; and 3) the express denial in S.B. 593 of intent to repeal any statute by implication (62 Del.Laws Ch. 351, § 17).

As with other instances of unclear state law, this Court cannot and does not purport to resolve the issue. Because negotiations concerning a new arrangement of the bilingual program are currently taking place,[89] the time is not appropriate for further examination by this Court.

## VII. *CONCLUSION*

As emphasized above, the current four-district plan is viewed as a good faith effort to respond to repeated judicial invitations for appropriate State authorities to come forward with their own meaningful solutions to vexing problems. The effort has fallen short of the mark in the critical area of pupil assignment. The deficiency is due to difficulties inherent in applying to four districts court-mandated minimal pupil assignment criteria that were tailored to a single district. It is a difficulty that can be easily and timely cured if the Delaware General Assembly should choose to do so.

The 60 day period will afford state authorities an opportunity to accomplish their avowed objective of achieving small school districts in the geographical desegregation area. If such legislation is signed into law, the State of Delaware will have come forward with a long overdue, responsible political solution, a course of action greatly preferred to a federal judicial decree. While the Court expresses no opinion on this issue—indeed can have no federal judicial interest in whether the desegregation area is organized as a single district or four districts—it applauds the willingness of state authorities to discharge their federal constitutional responsibilities.

An interim order will be entered in accordance with this Opinion.

the State Board of Education for its implementation of such a plan shall be binding upon the parties involved in accordance with § 122(a) of this title.

14 *Del.C.Ann.* § 1001(b) (Michie Supp. 1980).

**88.** *Warder* rejected a Family Court judge's assumed authority to order inter-district transfer of a student in the face of the districts' unwillingness to approve under section 602(a). The case is not dispositive here because in *Warder* there were no State Board regulations under 14

*Del.C.Ann.* § 122(b)(9) that might have limited the districts' statutory power. Arguably, the Hispanic transfer provision is just such a limitation.

**89.** Tr. M 96–101 (Harrison and counsel). The Regulations permit interdistrict rearrangement of bilingual facilities subject to approval of the State Board. S.B.Regs., § VII, B (P–4D81, Ex. 19 at 42).